ROBERTS et al. v. GRIBBLE.

No. 2395. Decided August 16, 1913 (134 Pac. 1014).

1. WATERS AND WATER COURSES—ACTIONS—SUFFICIENCY OF EVIDENCE. In an action to restrain defendant from interfering with certain subterranean waters beneath his land, evidence *held* to show that the waters in dispute were percolating waters. (Page 413.)

2. WATERS AND WATER COURSES—PERCOLATING WATERS—DIVERSION. Where waters percolated under defendant's land from adjoining irrigated land, making his land swampy and marshy, and from defendant's land percolated into the channel of a river, from which it was diverted by plaintiff for irrigation purposes, defendant had a right to drain his land by sinking wells and to use the water collected by means of such wells for the irrigation of his own land, although he thereby prevented it reaching the river.[1] (Page 413.)

APPEAL from District Court, Seventh District; *Hon. J. E. Booth,* Judge.

Action by Elizabeth Roberts and others against William H. Gribble.

Judgment for defendant. Plaintiffs appeal.

AFFIRMED.

*J. W. N. Whitecotton* for appellants.

*A. N. Cherry* and *J. W. Cherry* for respondent.

STATEMENT OF FACTS.

This is an action to restrain defendant from interfering with certain underflow or subterranean waters which pass beneath the surface of and through the defendant's land in

---

[1] Garns v. Rollins, 41 Utah, 260, 125 Pac. 867.

Sanpete County, Utah, and to quiet the title of the waters in plaintiffs.

The court, among others, made the following findings of fact, which are undisputed:

"(2) That Sanpitch River is a natural stream of water, arising in the upper part of Sanpete County, Utah, and in its natural state flows southerly and westerly through Sanpete County and across the defendant's said lands and south of plaintiffs' said lands and into the Sevier River. . . .

"(3) That the normal or usual flow of water in said river, except as hereinafter stated, is diverted and used by persons not parties hereto above the respective points of diversion of the parties to this action. That during the spring season, and until about the middle of the month of June of each year, a considerable quantity of water, commonly called 'high water,' usually flows in said river to the points of diversion of the parties to this action, and portions thereof are claimed, diverted, and used for irrigation purposes by the plaintiffs and the defendant upon their said lands. . . . (The title or right to the use of the 'high water' is not involved in this action.)

"(4) That previous to the year 1905 no water habitually flowed in said river to the respective points of diversion of the parties hereto, except the said 'high water,' and that up to that time said river was usually dry in the vicinity of the plaintiffs' and defendant's said lands after the said 'high-water' season was over as aforesaid. That about the year 1905, on account of the irrigation of the surrounding lands, a quantity of water began to seep and percolate and now seeps and percolates into the channel of said river, during the latter part of the summer of each year, at and below the defendant's said lands and, when not interfered with, flows down said river to the point of diversion of the plaintiffs, where the same has been diverted and used by plaintiffs, for the necessary irrigation of their said lands, ever since the said year 1905."

The court also made and filed the following findings of fact:

"(5) That in the month of June, 1910, the defendant constructed a number of wells by driving perforated pipe into the earth *a short distance south and away from the channel of said Sanpitch River* and in a natural depression upon the lands of said defendant and constructed a ditch leading therefrom, wherby a quantity of water varying in amount, but not exceeding one cubic foot per second of time, was developed from the percolating waters of his said soil and the waste from the irrigation of his said lands, which said water ever since has been and now is conducted by said defendant to and upon his said lands for the necessary irrigation thereof. That the water does not flow from said wells or through said ditch of defendant except during and immediately following the irrigation of the defendants' lands lying above.

"(6) That the said waters developed and used by said defendant, as aforesaid, never reached said Sanpitch River by any known or defined channel or course previous to the development and use thereof by the said defendant as aforesaid."

As conclusions of law the court found:

(1) That the waters developed and used by the defendant are percolating waters arising from his own lands, and (2) that the development and use thereof were and are no invasion or violation of any right of the plaintiffs. Judgment in conformity with the findings of fact and conclusions of law was rendered in favor of defendant. To reverse the judgment, plaintiffs prosecute this appeal.

McCARTY, C. J. (after stating the facts as above).

Appellants contend that the underground waters tapped by, and which flow from, respondent's wells are waters that flow in a known and defined channel beneath the surface of the river bed, and that these waters, when not diverted by the wells or otherwise interfered with, rise to the surface in the river channel below respondent's lands **1, 2** and flow down to appellants' dam and into their canal; that the water, therefore, is not subject to appropriation by

respondent, and hence the court erred in finding on the issues in favor of respondent. On the other hand, respondent contends that the evidence clearly shows that the waters in question are waste waters that seep and percolate from lands above and in the vicinity of the land upon which the wells are situated, and hence he has not only the legal right to drain his land of these waters but also the right to divert and make a beneficial use of them when thus collected.

The evidence shows that:

(1) Sanpitch River, as found by the court, flows across respondent's land upon which the flowing wells in question are located; (2) respondent purchased and went into possession of this land in the year 1900; (3) the channel of the river across this tract of land is quite shallow; (4) originally the course of the stream through this land was the same as it is at present; (5) during the "high-water" period of each year the stream, at or near the point where it enters respondent's land, overflowed to the south and in course of time washed out and created a new channel which curved to the south and west, returning to and forming a junction with the old channel about eighty rods west of the point where it departed therefrom; (6) the river in its course around this curve or bend would, during high water, overflow and damage respondent's land lying immediately south of the bend or curve; (7) in the year 1900 respondent straightened the channel and turned the stream into its original channel, causing it to flow approximately due west across his land as it had done in former years; (8) he did this to protect his land lying south of the bend from being flooded and damaged by the high water; (9) after the course of the stream was thus changed the land within the bend (between the two channels) grew up to grass and other vegetation, and respondent cut hay therefrom for several years thereafter.

It is conceded that the high-water period in that part of the state usually extends from early springtime to about the 15th day of June. Counsel for appellants in his brief, referring to the stream during its normal flow, says:

"The evidence . . . shows without contradiction that, at a point from a mile and a half or two miles above the defendant's land, all the waters of Sanpitch River are diverted from the main channel and are conveyed through canals for the irrigation of the lands lying south and southwest from the town of Gunnison, including lands of the defendant, and that said irrigated lands bordered upon the main channel of the Sanpitch River."

The court found, and the finding is neither disputed nor complained of, that in the year 1905, on account of the irrigation of the lands referred to by counsel, seepage water appeared on defendant's lands, and that this water flowed down the river channel and, when not interfered with, was diverted by appellants. And the undisputed evidence also shows that, because of the increased irrigation of the lands mentioned in recent years, much of defendant's land, and especially that portion lying within and immediately south and southwest of the bend of the river, became swampy and marshy and unfit for cultivation. On this point the defendant testified in part as follows:

"In 1907 the water appeared and destroyed our crops. In 1908 and 1909 we didn't put any in at all. The water was all over it (the land) shoe-top deep. During these years water appeared in the channel of the river all along where I drove these wells. . . . The wells were driven by driving a pipe in the ground from nine to twenty-five feet. . . . The wells are along the bend that used to be the channel of this river. It (the water) has run through every year in the channel of the creek, commencing three years ago."

Another witness testified:

"Previous to three or four years ago there never used to be any water running in the bed of Sanpitch River after the high-water season."

Reuben Christensen, one of the plaintiffs, testified regarding the amount of seepage water in the river channel prior to the year 1905 as follows:

"The water for our land was scarce after the high water in Sanpitch River, and lots of years we did not get any."

N. C. Sorensen, a witness for respondent, referring to the river channel at and above plaintiffs' dam, testified:

"I have crossed the river (channel) . . . hundreds of times during the summer and fall. I have seen the water flowing there, but not in the dry seasons—not in the low-water season. I mean the dry years and when high water is over. It would be dry practically every year up to the last five or six years."

Regarding the effect that the driving of the wells had on the seepage water that submerged his land, respondent testified as follows, and this testimony is not disputed:

"It was perfectly dry in fifteen days after I drove the pipe; that is, the water (disappeared) that was standing on my fields."

The evidence shows that water flows from the wells during the irrigation seasons only. When the crops are matured and the farmers, including respondent, cease irrigating their farms for the season, the water stops flowing from the wells. On this point respondent testified, and his testimony is not disputed:

"This water seems to fluctuate with the irrigation above. When we irrigate above, the wells flow a good big flow. The first time we watered this spring it was about six feet to the water in these wells, and the first time it raised a little over two feet, and the next time about the same, and the third time it came to the top and began to flow, and it increased in the creek gradually all over, and the wells flow a little now (August 4, 1911). I have not been able to use it this year because there is not enough to run in the ditch at all. It is a dryer season and not enough water coming up in the land."

We think the evidence both for appellants and respondent tends to show that the waters in dispute are seepage and percolating waters. These waters rose in such quantities on respondent's land that it became submerged and was rendered unfit for the raising of hay and other farm products. The respondent undoubtedly had a right to drain his land of the water and put it in a condition for raising crops.

Whether he did this by sinking wells or by digging drain ditches was of no concern to appellants. The water thus developed or collected being waste water which seeps and percolates into respondent's land from adjoining lands, he had the legal right to make whatever beneficial use of it he deemed proper, and he did not invade any right of appellant's by so doing. We think the right to the use of the water in this case comes squarely within the rule announced in the case of *Garns v. Rollins,* 41 Utah, 260, 125 Pac. 867, recently decided by this court.

The judgment is affirmed, with costs to respondent.

STRAUP and FRICK, JJ., concur.