## RASMUSSEN v. MORONI IRR. CO. et al.

No. 3392. Decided Jan. 7, 1920. On Application for Rehearing April 24, 1920. (189 Pac. 572.)

1. WATERS AND WATER COURSES—UPPER APPROPRIATOR MUST SHOW THAT WATERS DIVERTED DID NOT COME FROM STREAM. Where, after lands in vicinity were irrigated from the waters of a river, plaintiff's property became marshy and he collected the surplus water in a drain and diverted it so that it did not as it otherwise would have returned to the river, where it would be diverted by defendant, a lower prior appropriator, plaintiff has the burden of proving his contention that the waters be diverted came from a reservoir and not from the river.

2. WATERS AND WATER COURSES—WHERE WATERS USED FOR IRRIGATION WOULD RETURN TO STREAM, THEY CANNOT BE DIVERTED. Where, after irrigation of highlands was begun, plaintiff's land became marshy from seepage waters, and, though they would have returned to the stream from which they were diverted and were one of the sources of supply of the stream, plaintiff collected and diverted the waters to the prejudice of lower prior appropriator, he will be restrained in view of the fact such underground waters constituted the direct source of supply of the stream.[1]

On Application for Rehearing.

3. WATERS AND WATER COURSES—SEEPAGE WATERS MAY BE USED WHERE THEY ARE NOT DIVERTED TO THE PREJUDICE OF LOWER PRIOR APPROPRIATOR. Where seepage waters which would otherwise return to a stream and were part of the source of supply can be used by plaintiff on whose lands they collected, he may use them so long as such diversion does not prevent their return to the stream and injure the lower prior appropriator.

Appeal from District Court, Seventh District, Sanpete County; *D. H. Morris,* Judge.

Action by Amasa Rasmussen against the Moroni Irrigation Company and others.

---

[1] *Sullivan* v. *Mining Co.*, 11 Utah 438, 40 Pac. 709, 30 L. R. A. 186; *Crescent M. Co.* v. *Silver King M. Co.*, 17 Utah 444, 54 Pac. 244, 70 Am. St. Rep. 810; *Herriman Irr. Co.* v. *Butterfield M. Co.*, 19 Utah 453, 57 Pac. 537, 51 L. R. A. 930; *Herriman Irr. Co.* v. *Keel*, 25 Utah 96, 69 Pac. 719.

From a judgment for defendants, plantiff appeals.

MODIFIED, and as MODIFIED, AFFIRMED.

*Ferdinand Ericksen* and *S. A. King*, both of Salt Lake City, for appellant.

*Lewis Larson*, of Manti, for respondents.

FRICK, J.

The plaintiff, hereinafter called appellant, brought this action against the defendants, hereinafter styled respondents, to quiet title to certain water hereinafter more particularly referred to and to enjoin them from interfering with his use thereof for irrigation purposes. Appellant's claims to the water in question are fully and explicitly stated in the complaint.

After alleging that he is the owner of ten acres of land and the lessee of perhaps more than that amount in Sanpete county, describing the same, it is in substance alleged that the said lands in their natural state were arid, and, without water to irrigate them, were nonproductive; that since the year 1906 said lands "by reason of extensive irrigation of lands situated north, east, and south and above said lands causing water to filtrate and percolate through the same under the surface of the said lands in undefined and unknown channels," said lands "have become wet, boggy, and marshy and unfit for cultivation or production of agricultural crops." Appellant then alleges that in order to reclaim said lands from the condition just stated, and for the purpose of collecting the waters therein and to apply the same to a useful and beneficial purpose, namely, to irrigate other arid land, he constructed a certain drain ditch and placed earthen pipes therein to facilitate the drainage of said lands and by means thereof to collect the water aforesaid; that by means of said ditch and pipes appellant collected "one cubic foot of water per second from seepage and under-

ground sources upon said lands that had not theretofore found its way to the surface of the earth,'' etc.; that appellant applied said water collected as aforesaid for the irrigation of other lands. The appellant further alleges that respondents are wrongfully interfering with the water afore- said and are wrongfully diverting and using the same con- trary to plaintiff's rights, and that they prevent appellant from using said water as before stated. Appellant prays that the title to said water be quieted in him and that the respond- ents be enjoined from interfering therewith and from assert- ing any right thereto.

Some of the defendants answered the complaint, while others defaulted. The respondents here answered in two separate answers in which, after making certain admissions and denials, they set forth their claims to the water in question in detail and affirmatively alleged that they are the owners of the right to the use of the water by reason of prior appropriation and use for beneficial purposes and by virtue of a certain decree which is fully set forth. They prayed for affirmative relief. In view that the claims of respondents are sufficiently reflected in the findings of the court, we shall refrain from stating them further.

After a trial to the district court of Sanpete county, said court found the issues in favor of the respondents, and ad- judicated and decreed that they are the owners of the water here in question and enjoined plaintiff from interfering there- with. In view of the great length of the findings of fact, we are compelled to abridge them.

Omitting all matters of inducement, such as the findings relating to the incorporation of the several cities and irriga- tion companies and the appropriation of the waters of Sanpitch river, none of which matters are in dispute, the court in substance found: That the Sanpitch river is a natural stream having its source in the mountains north of the city of Fairview, and that it flows south- westerly through Sanpete county for a distance of over fifty miles; that the waters of said river are diverted there- from for irrigation purposes at divers points along the

stream; that for more than fifty years prior to the commencement of this action respondents, their predecessors in interest and grantors, have been and now are the owners "of all the waters of said Sanpitch river north" of a certain dam, to which we shall refer hereinafter, "as adjudicated and determined by a certain decree made and entered on the 17th day of July, A. D. 1901," by the district court of Sanpete county in a certain action then pending in said court; that appellant for more than nine years prior to the commencement of this action was and now is the owner of certain land hereinafter referred to, which is described; that said land at one time was arid and required irrigation to make it productive, but since the year 1898 said land "has become wet and boggy by reason of the irrigation of lands above it;" that for the purpose of improving said wet land, and "especially for the purpose of claiming the water to be intercepted by his drain," the appellant, in the year 1906, commenced the construction of a ditch or drain along the west side of his land and has thereby intercepted and collected "one-fourth of one second foot of water" up to and including the year 1915, which waters so collected and intercepted "were all tributary to the Sanpitch river and decreed to the" respondents; that in the year 1916 the appellant placed earthen pipes in said drain ditch and thereby collected a large amount of water amounting to "one cubic foot per second during the irrigation season of 1916, all of which waters so caught [collected] and intercepted were tributary to the Sanpitch river and had long prior thereto been decreed to the" respondents; that the waters collected and intercepted by appellant were by him caused to flow into Spring creek, a tributary of the Sanpitch river, and thence into said river, from which river (at a point lower down the stream than appellant's land) the respondents diverted the water and used the same each and every year for irrigation, culinary, and domestic purposes; that respondents have always claimed the water which was intercepted and collected by appellant as aforesaid; "that all of the waters in plaintiff's [appellant's] com-

plaint claimed as developed water, including all waters flowing from the drain, * * * are in truth and in fact percolating and return waters tributary to the waters of Sanpitch river, and that said waters were long since appropriated by the defendants [respondents] herein, and that all said waters were decreed to the defendants [respondents] herein by a certain decree made and entered on the 17th day of July, 1901,'' by the district court of Sanpete county in a certain action then pending in said court; that appellant's said drain ditch intercepts a part of the waters tributary to the Sanpitch river, and all the water intercepted and collected in said drain ditch is ''decreed water, decreed and awarded to the defendants [respondents] by the terms'' of said decree; that ever since the entry of said decree the respondents have used said water each irrigation season for irrigation, culinary, and domestic purposes; that the lands owned by respondents and irrigated by them are arid and would be sterile without water to irrigate them; that prior to the construction of appellant's drain ditch as aforesaid his said land was wet, boggy, and saturated with water which percolated into and was tributary to Sanpitch river, and was, during all of the time herein mentioned, used by the respondents upon their lands for irrigation purposes.

Upon substantially the foregoing findings, the court found as conclusions of law: (1) That the appellant is not entitled to any relief; (2) that respondents are entitled to the use of all the water intercepted and collected by and flowing through and from appellant's drain ditch; (3) that respondents are entitled to a permanent injunction against the appellant, etc.

Pursuant to the findings of fact and conclusions of law, the court entered a decree quieting the right to the use of said water in respondents and enjoined appellant from interfering with the same after it flows through his drain ditch into Spring creek as before stated, etc.

The appeal is from the decree.

While the assignments of error assail the findings of fact in some particulars, yet, in counsel's brief, the findings of

fact are not seriously questioned. Upon the other hand, counsel vigorously urge that the conclusions of law and the decree are against law. There is practically no conflict in the evidence, and the question to be decided is one of law rather than of fact. The question we must decide, therefore, is: To what relief, if any, in view of the undisputed facts, is appellant entitled?

In order to assist the reader to a better understanding of the questions herein decided, we append a rough sketch of the country surrounding appellant's land, together with the streams, including Sanpitch river, which are the sources of the water supply for both the appellant and the respondents. While the sketch does not correctly reflect either courses or distances, yet they are sufficiently accurate to afford a full understanding of the question which is to be determined by us.

The points marked "F" and "M" respectively, represent the cities of Fairview and Mt. Pleasant. The line marked "S. R." running north and south represents the Sanpitch river. The line marked "CC" running easterly and westerly represents Cottonwood creek. The line marked "SC" running in the same direction represents Spring creek, while the line marked "BC" also running in the same direction represents Birch creek. The parallelgram marked "A" represents appellant's land. The lines marked "d" "d" represent irrigation ditches through which water is diverted from Cottonwood creek and from Birch creek. The shaded square in the northeast corner of the sketch represents a reservoir in which water is collected from the melting snows during the early spring months. The straight line on the westerly side of appellant's land, which is marked "A," represents his drain ditch by which he intercepts and collects the water in question and diverts the same into Spring creek through the curved line at the north end of his land. The shaded square marked "Y" in the northwesterly part of the sketch represents land on which the water intercepted and collected by appellant is used and which is diverted onto said land from the Sanpitch river near the extreme northerly end of the sketch through a ditch indicated by a curved line leading from the river to appellant's land marked "Y." The small letters "xxx" indicate mountains along the easterly part of the sketch and also westerly of the river. The parallel lines marked "DC" represent the canal through which respondents divert all of the water flowing in Sanpitch river at the point marked "X" on the sketch, at which point there is a tight dam across the river for the purpose of diverting the water into said canal. The spaces on the sketch marked "irrigated land" represent the lands lying above and below appellant's land. The lands to the north, east, and south of appellant's land are irrigated with water coming from Cottonwood creek and from Birch creek, respectively, through the ditches marked "d" "d." The water formerly used by appellant to irrigate his land was taken from Birch creek

through the ditch marked "d" which is directly east of appellant's land, and the lands lying north, northeast, and some to the east of appellant's land were irrigated with water taken from Cottonwood creek. All the water flowing in Cottonwood creek and in Birch creek, as well as the small quantity flowing in Spring creek, which is an unimportant stream, are tributary to Sanpitch river and if not interfered with would flow into that river. Indeed, the drainage from all of the lands lying to the west of the mountains marked "xxx," and which are shown in the east side of the sketch, is into the creeks aforesaid and into the Sanpitch river. The waters collected in the reservoir which is situated near the summit of the mountains, but a little distance to the east of the summit, are waters which would flow easterly and not into Sanpitch river. Those waters, for the reasons hereinafter appearing, however, have no controlling influence upon the questions raised in this case.

The controlling features of this case, as we view them, are: (1) That appellant's land lies wholly within the water shed of the Sanpitch river; (2) that before appellant's land and the lands lying adjacent thereto and higher than his were irrigated they were arid and nonproductive; (3) that all the water used to irrigate appellant's land and the lands lying adjacent thereto and higher in elevation was taken from the streams that are tributaries of Sanpitch river, and if the water in said stream and the drainage, percolating, and seepage water from lands adjacent thereto be permitted to flow uninterruptedly, it all will reach said river before it is diverted by the respondents into their irrigating canal, and all of said water constitutes a source of supply of said Sanpitch river; (4) that the respondents, prior to the time that appellant commenced to intercept and collect the seepage and percolating water by means of his drain ditch, had appropriated and used for beneficial purposes all of the water from Sanpitch river flowing therein at a point some distance below appellant's land and lands lying adjacent thereto, and that all of the water that was used and is used to irrigate appellant's and said adjacent

lands was taken from Cottonwood creek, Spring creek, and Birch creek, all of which streams are tributary to Sanpitch river and empty into said river before the water used by respondents is diverted therefrom; (5) that all of the water flowing in said river reaching the point where it is diverted by respondents was decreed to respondents several years prior to the time when appellant commenced to intercept and collect the seepage and percolating water as herein before stated.

In making the foregoing statement we have designedly excluded the water that is collected in the reservoir for the reasons: (1) That the evidence shows that the drainage toward appellant's land is mainly from the east and southeast; (2) that his lands always were irrigated, so long as irrigation was necessary, with water taken from Birch creek and that the lands lying immediately to the east, southeast, and south of appellant's lands are irrigated with water coming from said creek; (3) that there is little, if any, evidence tending to prove that any of the water coming from said reservoir reaches or has reached appellant's land. Be that as it may, however, if appellant contends that any of the water which he claims in this action comes from said reservoir and not from streams or seepage which is naturally and directly tributary to Sanpitch 1 river, the burden of proof was upon him to establish that fact. Having failed to do that, the court's finding that all the water claimed by him is tributary to and if not interrupted always has flowed and would continue to flow into Sanpitch river must be upheld.

Notwithstanding the foregoing facts, appellant's counsel vigorously contend that the waters intercepted and collected by their client were mere seepage and percolating waters which he has a lawful right to collect and use as he may see fit. They further contend that the waters collected by appellant by means of his drain ditch clearly come within the decisions of this court. So that there may be no misconception regarding counsel's claims, we give them in their own language as found in their brief. In referring to the con-

dition of appellant's lands before they were irrigated, counsel say:

"Prior to the diversion of these waters on these highlands, there was no seepage or percolating water of any kind upon any part or portion of plaintiff's land. This fact is overwhelmingly established by the testimony offered. But after irrigation commenced on these uplands percolating and seepage waters appeared near the west end of plaintiff's lands and gradually extended in an easterly direction until the entire tract owned by plaintiff, as well as those leased by him, was rendered wholly unfit for the production of agricultural crops."

Counsel's theory seems to be that, in view that the title to appellant's lands passed from the government before the decree under which respondent's claim was entered, therefore appellant has the right to intercept and collect the seepage and percolating waters underneath the surface of his lands, regardless of the source of such waters. Upon that point they say:

"It will thus be observed that plaintiff's lands were reduced to private ownership as early as 1864; that a government patent issued therefor in 1881 (twenty years before defendants' rights to the waters of Sanpitch river were settled by decree of court); that twenty-five years elapsed after patent was issued before the seepage and percolating waters appeared upon the land in question and before they were sought to be collected by plaintiff from these privately owned lands."

In concluding the statement of facts they state their claim in the following words:

"We insist that plaintiff has the right to all the water he can collect in his drainage system, which is constructed wholly upon his own lands; that he has the right to use the water for beneficial purposes as he chooses, and to change the place of use, subject only to such limitations as may be imposed by law."

In support of their contention, they cite and rely upon the following cases emanating from this court, namely: *Sullivan* v. *Mining Co.*, 11 Utah 438, 40 Pac. 709, 30 L. R. A. 186; *Crescent M. Co.* v. *Silver King M. Co.*, 17 Utah 444, 54 Pac. 244, 70 Am. St. Rep. 810; *Herriman Irr. Co.* v. *Butterfield M. Co.*, 19 Utah 453, 57 Pac. 537, 51 L. R. A. 930; *Herriman Irr. Co.* v. *Keel*, 25 Utah 96, 69 Pac. 719; *Willow Creek Irr. Co.* v. *Michaelson*, 21 Utah 248, 60 Pac. 943,

51 L. R. A. 280, 81 Am. St. Rep. 687; *Garns* v. *Rollins*, 41 Utah 260, 125 Pac. 867, Ann. Cas. 1915C, 1159; *Roberts* v. *Gribble*, 43 Utah 411, 134 Pac. 1014; and *Peterson* v. *Eureka Hill M. Co.*, 53 Utah 70, 176 Pac. 729. All of the foregoing decisions, except the two in which the Herriman Irrigation Company was a party, are considered and reviewed in the recent case of *Stookey* v. *Green*, 53 Utah 311, 178 Pac. 586. The legal effect of those decisions and the principles upon which they rest are so clearly and ably stated by Mr. Justice Thurman that it would be a work of supererogation on the part of the writer to attempt a further review and statement. The only parallel between those cases and the case at bar is that seepage and percolating waters were involved and considered in them. While it is true that the water in question here is seepage and percolating water, yet it is also true that all of it is diverted from streams which are tributary to the Sanpitch river and is just as much a source of supply of that stream as though the water flowed directly into that river through the streams from which the water was and is diverted. Nor have the two Herriman Irrigation Company cases any controlling influence on this case, and no further reference to those cases is necessary. The only case in which it might be said that the facts and conditions somewhat resemble those of the case at bar is the case of *Roberts* v. *Gribble*, supra. The decision in that case is, however, squarely based upon the case of *Garns* v. *Rollins*, and the facts in the latter case necessarily take the Roberts decision entirely outside of the principles which must control the case at bar. If, however, the case of *Roberts* v. *Gribble* shall be construed so as to make it applicable to the undisputed facts of the case at bar, then the decision in that case must be distinguished and if necessary modified so as to limit the same to the facts in the case of *Garns* v. *Rollins*, which is the sole basis of the decision of the *Roberts* v. *Gribble Case*. When the undisputed facts which must control the decision in this case are compared with the facts of all the former decisions of this court, and when the explanation we have just made concern-

ing the *Roberts* v. *Gribble Case* is kept in mind. then it
must follow as the night follows the day that none of the
Utah cases can have any influence upon the decision in
this case. A mere cursory reading of the facts in this case,
viewed in the light of the prevailing conditions which are
reflected in the rough sketch appended hereto, should con-
vince the reader that the decision of the district court is
clearly right.

So that the controlling facts of this case may be thoroughly
grasped, we will briefly restate them. This case is one where
the water in question comes from a river system from which,
at a certain point, the respondents had diverted and put to
a beneficial use all of the water flowing in the stream at
the point of diversion for many years prior to the time
when appellant commenced to intercept and collect the water
in question. Appellant and others owned land lying on
this stream but higher up the stream. All of these lands
without irrigation were arid and nonproductive. In order
to make the lands productive, water was diverted by appel-
lant and others who owned lands adjacent to and above his
from the streams that formed a part of what we have termed
the river system. Water after being used on said lands
caused some of them, and especially such as are somewhat
depressed, which is the condition of appellant's lands, to
become saturated with the irrigation water and thus, in
the language of the findings of fact, made them wet and
boggy and unfit to produce the usual farm crops. The water,
however, which caused appellant's land to become saturated,
wet, and boggy all seeps and percolates through the earth
from the irrigated lands lying higher in elevation than do
his lands and which water was originally diverted from the
river system above respondents' point of diversion; and all
of the water which was used on appellant's land, as well as
that used upon the lands lying above his, would naturally
flow into and become a part of the river system before it
reaches respondents' canal by means of which the water is
diverted on to their lands, all of which lie lower down on
the river system than where it is diverted by the canal

aforesaid. The prior right to the use of all of the water which reaches respondents' point of diversion, including all of the seepage and percolating water passing through and underneath the surface of all other lands lying adjacent to and above appellant's land, in the year 1901 and a long time before appellant commenced to intercept and collect said water, were, by the district court of Sanpete county, in an action therein pending to which at least many of the parties hereto were parties, adjudged and decreed to the respondents.

In view of all those facts and the concessions made in appellant's brief, how can it successfully be contended that he can legally acquire any right to the waters which seep and percolate through and underneath the surface of his land as against the respondents' prior rights? The principle involved here is precisely the same as though the appellant were seeking to appropriate a cubic foot of water from either Cottonwood creek or Birch creek, both of which, it is conceded, are tributaries of Sanpitch river and empty into it at points above respondents' diverting dam. If he attempted to do that, every one, we think, would pronounce his act as unjustified by the laws of this state. In principle what he is attempting to do, however, in no way differs from an attempt to divert water from those streams directly. The water which he claims in this action necessarily comes from the tributaries of Sanpitch river and hence in contemplation of law comes from that river. All the water which comes from streams which empty into Sanpitch river is as much a part of that river as though that river had no tributaries and as though its source of supply flowed directly into that stream from surface and underground sources. It must be remembered that in this mountainous country all streams are necessarily, to some extent at least, fed from underground sources as well as from surface sources. Indeed, the water which flows in the middle and lower reaches of our mountain streams from which the water is diverted for irrigation and domestic uses after the high-water season is passed, and when we have arrived at what is called the low-water

stage, nearly all reaches those streams through underground and invisible channels. The porous and gravelly nature of the soil of our mountains, foothills, and even the higher bench lands, tends to freely absorb the water that comes from the melting snows in the spring and thus seepage and percolating waters form a not inconsiderable part of the supply of all of our irrigating streams. When therefore all of the water is appropriated by a prior appropriator which flows in a given stream at some point some distance down said stream, such appropriator acquires a right to all of the sources of supply of such stream whether visible or invisible, or whether underneath or on the surface. The porous and gravelly condition of our mountains and higher bench lands, as well as the more elevated irrigated lands, thus retard the flow of the water into the mountain streams. By that means much water is conserved for irrigation and other uses for the latter part of the irrigation season which, if it flowed directly into the streams as the spring sun melts the snows, would be entirely lost and wasted. These mountains and highlands thus act as natural reservoirs and in a measure accomplish what would be accomplished by artificial storage of water. The first appropriator on the stream, however, acquires a prior right to the use of all those waters, and no subsequent appropriator may interfere either directly or indirectly with the rights of the prior appropriator. If, however, the appellant may cut off one of the sources of supply of Sanpitch river, any other landowner and water user may cut off another source of supply, and so on until all the sources of supply which pass underneath the surface of the soil are cut off, and thus the lower and prior appropriator would be left without any, or at least only a meager, supply of water in the low-water season. This may not legally be done.

This case affords a most striking illustration of the injury that might thus be inflicted upon the prior appropriators of water whose lands lie lower down the stream. No case has been called to our attention, and we think none can be found, where it is held that under facts and conditions like those

in this case a water user higher up the stream may interfere with the prior rights of a lower appropriator on a stream so as to diminish to any appreciable extent the quantity of water which is being beneficially and necessarily used lower down the stream by such appropriator. True, an appropriator may, under certain circumstances and conditions, divert the water from the stream during the high-water season and use it upon higher lands, and in that way retard and perhaps temporarily diminish the actual flow into the stream, provided he does not so far divert the water that it will not find its way back into the stream and thus continue to be available to the prior appropriator and user farther down the stream. To do merely that, however, injures no one, and the courts encourage such a use whenever it is made apparent that the prior appropriators and users lower down the stream will not be materially affected in their rights  By such means the beneficial use of water may be enlarged and no one be injured. If, however, water is thus being used on the higher lands along the stream or river system, and after such use it is attempted to be cut off from the stream or river system and is attempted to be used to the prejudice of the prior appropriator and the lower user, the courts will enjoin such interference. Such is clearly the principle upon which the decision in *Comstock* v. *Ramsay*, 55 Colo. 244, 133 Pac. 1107, is based. The principle we invoke and seek to enforce in this case is so well stated by the author in 2 Kinney, Irr. and Water Rights, at sections 1193 and 1194, that we take the liberty of quoting somewhat at length from the latter section. After referring to the fact that there are different classes of seepage and percolating waters, and that the courts in the arid region where the right to appropriate and to divert water for beneficial purposes from the streams exists are recognizing the different classes of such waters, the author says:

"It was not until the more recent scientific investigations, before mentioned, as to the movements of underground waters through the soil, that these percolating waters tributary to surface waters were recognized as belonging to any particular class, or that any rights

could be acquired in them other than the rights which could be acquired to the soil itself, through which they found their way, of which soil, under the prevailing common law rule, they were considered component parts. But, by these geological and topographical investigations made by the government and others, it has been proven in many instances that waters percolating through the soil of watersheds were not only the sources of supply, but the only source of supply of certain streams and other surface bodies of water. It being proven absolutely that these percolating waters physically are directly tributary to these streams, the law has kept pace with these scientific investigations proving this fact; and therefore it follows that in law they should be, and in many jurisdictions are, dealt with and treated as tributary waters. And, where rights to the waters of the stream itself have been once acquired, by appropriation or otherwise, it is unlawful for persons owning land bordering on the stream to intercept the waters percolating through them on their way to the stream, and apply it to any use other than its reasonable use upon the land upon which it is taken, if he thereby diminishes the flow of the stream to the damage of those having rights therein. Therefore this rule modifies the common-law rule that the owner of the land is also the owner of all the water found percolating as a part of the soil itself, and that he may use and dispose of it as he sees fit, to the extent that he may only use these waters so percolating through his land, subject: First, to the rights of others to the water flowing in the stream which this water augments, upon the same principle as though this water was a part of the stream itself. * * *"

By what we have said we do not wish to be understood as holding that the appellant may not drain his lands and by that means reclaim them. In doing that he must, however, permit the water he drains therefrom to flow into the Sanpitch river for the use of respondents, precisely as that water flowed into the river before he commenced his drainage system.

Neither do we wish to be understood that under no circumstances may seepage and percolating waters be intercepted and collected, appropriated and put to a beneficial use by the one who intercepts and collects them. See *Stookey* v. *Green*, supra.

Nor do we hold that the appellant would not be entitled to use an amount of water equal to the amount of his original appropriation when used upon lands other than those for

which the water was originally appropriated, provided he uses the water so that it will find its way back into the stream as did the water when used upon the lands for which it was originally appropriated. If the status quo is substantially maintained and the prior appropriators are not materially affected in the use of water, it is not material upon what land appellant applies his · water; but he may not either directly or indirectly interfere with the water so as to substantially affect the rights of a prior appropriator.

To avoid, if possible, any misconception respecting the scope and meaning of this decision, we, in conclusion, feel constrained to remind the reader that this case belongs to a class which is readily distinguishable from all other classes known to the law covering the subject of irrigation. This case falls within what for convenience may be denominated "a river system case" which arises and can arise only in irrigating lands which lie along and within the watershed of a river, stream, or water course whether natural or artificial, from which the seepage and run-off water arising from irrigation if not intercepted will eventually return to the stream or water course from which it was originally appropriated by prior appropriators and diverted by them at some point further down the stream. In such cases the rights of prior appropriators may not be interfered with, not even by the owners of lands from, through, or underneath the surface of which the seepage and percolating water passes on its return to the stream or river system. The fact that the water in question may be percolating or seepage, as contradistinguished from water flowing in known and defined underground channels, does not alter the case. The controlling question always is: Was the water in question appropriated and put to a beneficial use by others before the interception and attempted appropriation thereof by the landowner? We feel certain that we venture nothing in saying that it is a matter of common knowledge that by far the greater portion of irrigated lands in this state are included within the area of river systems. Notwithstanding that fact, however, this case, so far as we are aware, is the

first of its kind coming to this court, and it is for that reason, as well as for others which will readily suggest themselves, that we recognize the great importance of this decision. While the principles herein announced will of necessity apply to all waters flowing within all river systems in this state, they are nevertheless not intended to apply to any other condition. Nor is this decision intended to apply to what are known as artesian or subterranean waters the sources of which lie deep beneath the earth's surface. Nor is the doctrine herein announced in any way in conflict with any of the former decisions of this court.

From what has been said it follows that the judgment should be, and it accordingly is, affirmed, with costs to respondents.

CORFMAN, C. J., and WEBER, GIDEON, and THURMAN, JJ., concur.

----

## On Application for Rehearing

FRICK, J.

Appellant has filed a petition for rehearing, in which it is urged that this court erred in unconditionally affirming the judgment of the district court and in not modifying it in certain particulars. As usual, counsel, who have filed a brief in support of the petition, see, or think they see, a multiplicity of evils that will necessarily result if the opinion of this court be not modified in many respects, and especially as it affects the appellant. In making the present contention counsel no doubt have overlooked the fact that, although they assigned the district court's ruling in restricting appellant so that he could use the water only upon the land from which it is drained, they nevertheless did not argue that question in their brief and hence had waived it. The only contention made in their brief was that the water in

question was seepage and percolating water, and hence plantiff had a right to use it whenever and wherever he pleased regardless of respondents' claims.  It was not contended, nor did it appear from anything that was said, that appellant had any use for the water or that he could so use it as not to interfere with respondents' prior right. That claim is now advanced for the first time and it is based entirely upon what is said in the opinion.  No doubt, if the appellant can use the water in such a manner as not to interfere with respondents' prior right as pointed out in the opinion, then the restriction that is placed upon appellant by the judgment is too narrow, in that, it restricts him to the use of the water upon the very lands that are being drained.  As pointed out in the opinion, if appellant can use the water upon lands, and in thus using it he does not interfere with the prior rights of the respondents, the use is not one of which they may legally complain.  If therefore water, although used by appellant, is nevertheless permitted to find its way back into the stream at or before it reached respondents' point of diversion in substantially the same manner and quantity as though it were not used by him, no legal injury can result to any one.  Had appellant's counsel presented such a case, and had they demanded relief upon that theory, it is quite probable that the judgment would not have been affirmed in the very form it was entered; and it is also quite probable that the lower court would not have placed the restriction upon him it did.  As a matter of course, appellant is entitled to the same rights as are all the other water users along the river system, and that is so regardless of the fact that he may have claimed more than he was entitled to under the law.

Counsel also lay much stress upon the fact that we used the word "precisely" in referring to the fact that, if water is used upon lands lying above the point of diversion of a prior appropriator by a subsequent appropriator, the latter must nevertheless so use it as to permit the water to find its way back into the stream above the prior appropriator's point of diversion.  By using the term "precisely" we did

not mean that the water must be permitted to flow into the stream as it originally flowed, but what is meant is that the subsequent appropriator may not so use it as to interfere with the rights of the prior appropriator. That is the paramount thought when treating that subject in the opinion, and no one who reads it attentively will be misled merely because a word may have been used which is too restrictive if considered by itself.

In view therefore that appellant may have use for the water on lands other than those from which it is drained and in using it may not interfere with respondents' prior rights, the judgment or decree should be modified **3** so as to permit appellant to use it, or any part or it, upon lands other than those from which it is drained if such use can be made without interfering with respondents' prior rights as pointed out in the original opinion. To that extent, therefore, the original opinion is modified, and the cause is remanded to the district court to modify the judgment and decree as indicated. In view, however, that appellant did not appeal from the judgment upon that theory and did not come here seeking that relief, the judgment respecting costs will not be modified. In all other respects the original opinion is adhered to.

CORFMAN, C. J., and WEBER, GIDEON, and THURMAN, JJ., concur.