## SNAKE CREEK MINING & TUNNEL COMPANY *v.* MIDWAY IRRIGATION COMPANY ET AL.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH CIRCUIT.

No. 68. Argued October 17, 1922.—Decided January 15, 1923.

Under the law of Utah, an appropriation of the water of a natural stream to a beneficial use so far attaches to underground waters feeding the stream by percolation through adjacent public lands, that one who, as an incident to mining operations after those lands have become private, intercepts and collects such percolating waters by a tunnel, is not entitled to sell to others the right to use on distant lands the waters so collected and thus injuriously diminish the supply of the prior appropriator. P. 598.

271 Fed. 157, affirmed.

CERTIORARI to a decree of the Circuit Court of Appeals reversing a decree of the District Court, in a suit to determine conflicting claims to underground waters.

*Mr. H. R. Macmillan,* with whom *Mr. Andrew Howat, Mr. John A. Marshall* and *Mr. B. S. Crow* were on the briefs, for petitioner.

*Mr. A. B. Irvine* and *Mr. William H. Folland,* with whom *Mr. Sam D. Thurman* was on the briefs, for respondents.

*Mr. William H. Folland,* by leave of court, filed a brief on behalf of Salt Lake City, as *amicus curiae.*

*Mr. J. F. Callbreath,* by leave of court, filed a brief on behalf of the American Mining Congress, as *amicus curiae.*

MR. JUSTICE VAN DEVANTER delivered the opinion of the Court.

This is a suit to determine conflicting claims to underground waters collected and brought to the surface by a mining tunnel in Utah. The plaintiff (petitioner here) is a mining company incorporated in Delaware and the defendant an irrigation company incorporated in Utah. Each seeks to have the right to use the waters quieted in itself as against the other. The District Court, with some hesitation, gave a decree for the mining company, which the Circuit Court of Appeals reversed with a direction that one for the irrigation company be given. 271 Fed. 157. A writ of certiorari brings the case here. 256 U. S. 687.

The mining company owns and operates a mine in a mountain along a tributary of the Provo River and, in furtherance of its mining operations, has driven a tunnel 14,500 feet into the mountain from a portal near the stream. The tunnel intercepts and collects waters percolating through the bosom of the mountain and conveys them to the portal, whence they now flow into the stream. The tunnel was begun in 1910 and these waters are intercepted and collected along its course after it gets well into the mountain. The mining company owns a tract of land surrounding the portal and we assume it has a right of way for the tunnel beyond that tract, although this does not appear. It has not used and does not now use any of the waters in connection with its tunnel or mine, but asserts an exclusive right to them and has arranged, and is intending, to sell to others the right to use them for irrigating distant lands.

The irrigation company is a corporate agency of a community of farmers and holds, controls and administers for their mutual advantage the water rights which enable them to irrigate and cultivate their lands, all of which are naturally arid. Long prior to the driving of the tunnel, and while the lands through which it extends were

public lands of the United States, the irrigation company
or its stockholders appropriated all the waters of the
stream for irrigation and other beneficial uses; and under
that appropriation these waters long have been applied
and devoted to such uses on the lands of the stock-
holders some distance down stream from the portal of the
tunnel.

The waters intercepted and collected by the tunnel are
percolating waters which before it was driven found their
way naturally,—but not in a defined channel,—through
the rocks, gravel and soil of the mountain into open
springs near the stream and thence by surface channels
into the stream. At all seasons this was one of the
stream's sources of supply, and in the late summer and
early fall one of its most dependable sources. The
amount of water so naturally finding its way under-
ground into the springs and thence into the stream has
been materially diminished by the tunnel,—the diminu-
tion conforming substantially to the discharge at the por-
tal. All the natural flow of the stream as it was before
the tunnel was driven is required to satisfy the prior ap-
propriation of the irrigation company or its stockholders
and to irrigate the lands of the latter, to which it long
has been applied; and, unless the waters so intercepted
and collected by the tunnel be permitted to flow from its
portal into the stream in such way that they can be used
under the prior appropriation, a material part of the
lands heretofore reclaimed and irrigated thereunder will
be without water and their cultivation must be discon-
tinued.

Several questions were presented to and decided by the
Circuit Court of Appeals, but only one merits discussion
here. It is whether under the law of Utah the waters
which the tunnel intercepts, collects and conveys to its
portal belong to the mining company or are within the
appropriation made by the irrigation company or its

stockholders before the lands through which the tunnel extends became private lands.

The parties, while agreeing that the Utah law is controlling, differ as to what that law is. On the part of the mining company it is contended that when the tunnel site was acquired and the tunnel driven, Utah had adopted and was applying the common-law rule respecting underground waters; that by that rule such waters, where not moving in a known and defined channel, are part of the land in which they are found and belong absolutely to its owner; and that, if the law of Utah in this regard has since been changed, rights vested before the change are not affected by it. On the part of the irrigation company it is insisted that the common-law rule never was adopted or in force in Utah; that her law always has regarded waters percolating underground, where within the public lands, as open to appropriation for irrigation or other beneficial uses, subject only to a reasonable use of them in connection with the land in which they exist by whoever may come to own it, and that her law likewise has regarded an appropriation of the natural flow of a surface stream as reaching and including its underground sources of supply within the public lands, subject only to the qualification just indicated.

Both courts below experienced some embarrassment in solving this question of Utah law,—the District Court observing that the Supreme Court of the State, although having the question before it a number of times, " has never definitely announced its adherence " to either view, and the Circuit Court of Appeals that the early decisions, although " not always harmonious," " seem to have favored the English rule," while the later decisions have given effect to the other view. That there was some basis for the embarrassment is plain. Particularly was this true when the District Court made its ruling. Thereafter, and before the ruling by the Circuit Court of Appeals, the

situation was partly clarified by two decisions in the state court,[1] and it now has been further clarified by two still later decisions in that court.[2]

Utah is within the semi-arid region of the West, where irrigation has been practiced from the time of the earliest settlements and is indispensable to the cultivation of the lands. She was made a Territory in 1850 and became a State January 4, 1896. While she was a Territory and most of the lands within her borders were part of the public domain, Congress passed three acts which require notice.

The Act of July 26, 1866, c. 262, 14 Stat. 251, provided, in its ninth section: " Whenever, by priority of possession, rights to the use of water for mining, agricultural, manufacturing, or other purposes, have vested and accrued, and the same are recognized and acknowledged by the local customs, laws, and the decisions of courts, the possessors and owners of such vested rights shall be maintained and protected in the same." The Act of July 9, 1870, c. 235, 16 Stat. 217, declared, in its seventeenth section, that " all patents granted, or pre-emption or homesteads allowed, shall be subject to any vested and accrued water rights " recognized by the provision of 1866. And the Act of March 3, 1877, c. 107, 19 Stat. 377, after providing for the sale of desert lands in small tracts to persons effecting the reclamation thereof by an actual appropriation and use of water, declared that " all surplus water over and above such actual appropriation and use, together with the water of all lakes, rivers and other sources of water supply upon the public lands and not navigable, shall remain and be held free for the appropriation and use of the public for irrigation, mining and manufacturing

---

[1] *Stookey* v. *Green*, 53 Utah, 311; *Rasmussen* v. *Moroni Irrigation Co.*, 56 Utah, 140.

[2] *Peterson* v. *Lund*, 57 Utah, 162; *Horne* v. *Utah Oil Refining Co.*, 59 Utah, 279.

purposes subject to existing rights." This Court has said of these enactments that " the obvious purpose of Congress was to give its assent, so far as the public lands were concerned, to any system, although in contravention of the common law rule, which permitted the appropriation of the waters for legitimate industries."

By an Act of February 20, 1880, the legislative assembly of the Territory declared (Laws 1880, c. 20, § 6) : "A right to the use of water for any useful purpose, such as   .   .   . irrigating lands,   .   .   .   is hereby recognized and acknowledged to have vested and accrued, as a primary right,   .   .   .   under any of the following circumstances: First—Whenever any person or persons shall have taken, diverted and used any of the unappropriated water of any natural stream, water course, lake, or spring, or other natural source of supply.   .   .   ."

It was in the presence of these enactments, congressional and territorial, and prior to any decision thereon in Utah, that the irrigation company or its stockholders made the appropriation in question.

The first case in Utah involving rights asserted under an appropriation such as is described in these enactments was *Stowell* v. *Johnson,* 7 Utah, 215. The controversy was between one who relied on such an appropriation from a surface stream and another who owned lands along a lower section of the stream and was relying on the common-law doctrine of riparian rights. The Supreme Court of the Territory sustained the appropriation and distinctly held that the common-law doctrine was not applicable to the conditions in the Territory and never was in force there. On the latter point the court said (p. 225) : "Riparian rights have never been recognized in this Territory, or in any State or Territory where irrigation is necessary; for the appropriation of water for the purpose of irrigation is entirely and unavoidably in conflict with the common-law doctrine of riparian proprietorship. If that had

been recognized and applied in this Territory, it would still be a desert; for a man owning ten acres of land on a stream of water capable of irrigating a thousand acres of land or more, near its mouth, could prevent the settlement of all the land above him. For at common law the riparian proprietor is entitled to have the water flow in quantity and quality past his land as it was wont to do when he acquired title thereto, and this right is utterly irreconcilable with the use of water for irrigation. The legislature of this Territory has always ignored this claim of riparian proprietors, and the practice and usages of the inhabitants have never considered it applicable, and have never regarded it." This ruling has been reaffirmed but never recalled or qualified.

The next case was *Sullivan* v. *Northern Spy Mining Co.,* 11 Utah, 438. It involved an asserted appropriation of underground water, not in a known or defined channel. At the time of the appropriation the land where the water was found was public land. Afterwards the land was located and patented under the public land laws. The appropriator continued, as before, to take and use the water, and the owner of the land challenged the appropriation and sued to recover damages as for a trespass. In stating the question for decision, the territorial court said: " The federal government, as proprietor of the public lands, early recognized the necessity of permitting persons in this arid region to acquire an interest in water sources on the public lands distinct from the lands themselves. It had always been the settled law that the owner of land was likewise the owner of all waters situate thereon or percolating therein. This may be said to have been the universal rule in the United States, prior to the settlement of California. Local decisions, arising from the necessities of the people, soon altered it there, and in 1866 Congress passed an act," etc. " The question is, then, is the right of defendant to use water, under the facts stated,

one that is recognized by the local customs and laws? " The court reviewed the enactments we have set forth above, said they should not be narrowly construed, and held (p. 443): " In our opinion, wherever the industry of the pioneer has appropriated a source of water, either on the surface of or under the public lands, he and his successors acquire an easement and right to take and use such water to the extent indicated by the original appropriation, and that a private owner who subsequently acquires the land takes it burdened with this easement, and we also hold that this easement carries with it such rights of ingress and egress as are necessary to its proper enjoyment." But, notwithstanding this very definite pronouncement, the court, in concluding its opinion, added (p. 444): " This right of an appropriator is, of course, subject to the rule of law which will permit the owner to sink an adjoining well on his own premises although he should thereby dry up that of the first appropriator." This addendum was inconsistent with the principal decision and, so far as appears, was not necessary to a full disposal of the case. With this comment it may be put out of view, for the court afterwards declared it dictum.[1]

Shortly after the decision in that case came the constitution of the State, which says (Art. 17, § 1): " All existing rights to the use of any of the waters of this State for any useful or beneficial purpose, are hereby recognized and confirmed."

The next case to engage the court's attention was *Crescent Mining Co.* v. *Silver King Mining Co.*, 17 Utah, 444. It presented a controversy between two mining companies over percolating water intercepted and collected by a tunnel. One company had driven the tunnel into two patented mining claims of which it was the owner and had been permitting the water to flow from the portal into a

---

[1] *Stookey* v. *Green*, 53 Utah, 311, 317.

so-called lake. The water was not a natural source of supply for the lake, nor had it been in any way appropriated before the mining claims were patented and the tunnel driven. After it began flowing through the tunnel and thence into the lake the other company attempted to appropriate it at the lake by diverting it therefrom and using it. The company owning the tunnel challenged that appropriation and proceeded to use the water for purposes which prevented it from flowing into the lake. The other company then brought the suit, claiming that by its appropriation it had acquired a right to have the water flow from the tunnel into the lake uninterruptedly and continuously. The court held that underground waters collected by a tunnel from the private lands of its owner were not open to subsequent appropriation by others, and that the company owning the land and tunnel and bringing the waters, theretofore unappropriated, to the surface had the better right to use them. This, without more, determined the controversy; but in the opinion much was said which, had it been essential to a decision of the case, might well be taken as commiting the court to the common-law rule respecting underground waters. But it was not essential, and the court has since recognized that the real decision was as we have just stated.[1]

For several years after the ruling in that case the decisions were largely in a state of flux,—the opinions disclosing pronounced differences among the judges and tending at times in favor of the common-law rule and at other times against it. A notable case of that period was before the court on two successive appeals. *Herriman Irrigation Co.* v. *Butterfield Mining Co.;* 19 Utah, 453; *Herriman Irrigation Co.* v. *Keel,* 25 Utah, 96. Like the present case, it involved a controversy between an irrigation com-

---

[1] *Stookey* v. *Green,* 53 Utah, 311, 318; *Horne* v. *Utah Oil Refining Co.,* 59 Utah, 279.

pany having an early appropriation of the natural flow of
a surface stream and a mining company having a subse-
quent patent for adjacent lands pierced by a tunnel which
encountered underground waters and conducted them to
its portal whence they flowed into the stream. As here,
the mining company had arranged to sell to others the
right to use the waters elsewhere. Two matters were in
dispute,—first, whether the underground waters consti-
tuted one of the stream's natural sources of supply, and,
secondly, if they did, whether the mining company was
entitled to take and sell them as against the irrigation
company which had appropriated the natural flow of the
stream when the lands pierced by the tunnel were public
lands. On the first appeal the judgment of the trial court
was reversed and a new trial directed because of incom-
plete and erroneous findings of fact; but the plain pur-
port of the opinion, which had the approval of all the
judges, was that if in fact the waters collected by the
tunnel constituted one of the stream's natural sources of
supply at the time its natural flow was appropriated by
the irrigation company, which was when the lands were
part of the public domain, that company had the better
right to those waters. On the second appeal the decision
turned chiefly on questions of fact; but the judges, in sep-
arate opinions, entered into an extended discussion of the
question of law with which we here are concerned. One
judge thought the common-law rule was in force, and an-
other that it had been rejected and that the decision on
the first appeal had proceeded on that view. The remain-
ing judge left his attitude on the question in some uncer-
tainty. The case settled no principle and is without force
as a precedent. Other cases during the same period are
cited by counsel and particular expressions in the opinions
are relied on as making for one view or the other; but it
suffices here to say of these cases that they do not show
any settled rule of decision.

The later decisions have all tended in one direction and have resulted in establishing the rule for which the irrigation company contends, and which the Circuit Court of Appeals applied. These decisions frankly deal with the prior situation as we have described it, reaffirm the principles announced in the early cases of *Stowell* v. *Johnson* and *Sullivan* v. *Northern Spy Mining Co.*, point out the dicta and uncertainty in the opinions delivered in several cases, hold that the common-law rule is not applicable to the conditions in Utah, and show that it never was definitely adopted or followed there. *Mountain Lake Mining Co.* v. *Midway Irrigation Co.*, 47 Utah, 346; *Bastian* v. *Nebeker*, 49 Utah, 390; *Peterson* v. *Eureka Hill Mining Co.*, 53 Utah, 70; *Stookey* v. *Green*, 53 Utah, 311; *Rasmussen* v. *Moroni Irrigation Co.*, 56 Utah, 140; *Peterson* v. *Lund*, 57 Utah, 162; *Horne* v. *Utah Oil Refining Co.*, 59 Utah, 279.

We conclude, therefore, that the decree of the Circuit Court of Appeals was right.

*Decree affirmed.*

Mr. Justice Sutherland did not take part in the consideration or decision of this case.