[Nos. 3408, 3420. April 12, 1929.]

[Rehearing Denied April 16, 1930.]

YEO, State Engineer, v. TWEEDY.

SAME v. PEARSON et al.

[286 Pac. 970.]

Tomlinson Fort, of Roswell, for appellant.

Hurd & Crile, of Roswell, and M. A. Otero, Jr., Atty. Gen., for appellee.

Hurd & Crile, of Roswell, and M. A. Otero, Jr., Atty. Gen., for appellant.

Roberts & Brice, of Santa Fe, and Reese & Reese, of Roswell, for appellees.

## OPINION OF THE COURT

WATSON, J.

John Tweedy appeals from a decree enjoining him (at the suit of the state engineer) from sinking a well upon land owned by him for the purpose of tapping underlying artesian waters without having first obtained a license from the state engineer. The state engineer appeals from a decree denying an injunction against Oscar Pearson and another to enjoin them from doing the same act. The two appeals have been heard, and will be decided together. Involving the interpretation and validity of chapter 182, Laws of 1927, far-reaching results attend their decision. As befits their importance, they have been exhaustively argued and briefed by able counsel.

The Pearson case has taken a wider range, both in the district court and here. Consequently our reference will be to that case, unless the other is specifically mentioned.

The findings of the trial court may be condensed into the following statement: In Southeastern New Mexico, in Chaves and Eddy counties, are two artesian basins; the one extending from above Roswell to about 8 or 10 miles below that city, the other southward therefrom. Between and separating the two is an impervious dike some 4 or 5 miles in width. These basins are supplied by the percolations of a watershed something like 80 miles in length, north and south, by 20 miles in width. The areas of the basins have been recently ascertained by scientific investigation. Since their discovery, the sinking of flowing wells, and the large use of water therefrom for irrigation, have considerably diminished the eastern and western limits of artesian pressure. The original supply has been drawn

upon in this manner to an extent that further draughts, in excess of the replacement from natural sources, will tend to the lowering and final depletion of the artesian pressure and of the water supply itself.

Chapter 182 of the Laws of 1927 above referred to, omitting the title and the enacting and emergency clauses, is as follows:

"Section 1. All waters in this state found in underground streams, channels, artesian basins, reservoirs, or lakes, the boundaries of which may be reasonably ascertained by scientific investigations or surface indications, are hereby declared to be public waters and to belong to the public, and subject to appropriation for beneficial uses under the existing laws of this state relating to appropriation and beneficial use of waters from surface streams.

"Sec. 2. The state engineer shall have the supervision and control of all such underground waters and of the method and manner of appropriation and use thereof, under the laws of this state.

"Sec. 3. All waters of such underground streams, channels, artesian basins, reservoirs, or lakes, now being used for beneficial purposes, are hereby recognized as valid appropriations of such waters and hereby confirmed, and such use shall be subject to the rules and regulations of the state engineer under the laws of this state.

"Sec. 4. This act is not intended to apply to the construction of wells by persons, corporations, or municipalities to obtain waters for domestic or stock watering purposes.

"Sec. 5. Upon the passage and approval of this act, the state engineer of the state of New Mexico shall proceed to the administration of the same as to any particular underground stream, channel, artesian basin, reservoir, or lake as defined in Section 1 hereof, upon a petition being presented to him requesting him so to do, signed by not less than ten per cent. of all the users of waters of such defined underground streams, channels, artesian basins, reservoirs, or lakes."

After the taking effect of the foregoing act, a petition filed with the state engineer asked him to proceed to the administration of "the Roswell artesian basin." This petition treated as one the two artesian basins lying in the area above described, and was signed by 10 per cent. of the water users thereof. The proposed well of appellees lies in the southerly of the two.

The most important constitutional objection urged against chapter 182, and that which strikes at the fundamental principle of the legislation, is that it ignores and

overrides vested property rights of those who, antedating the enactment, were private owners of lands overlying the basin. If as appellees contend, they had, as incident to their ownership of land, a vested property right in the corpus or the *usufruct* of the underlying waters, various provisions of the state and Federal Constitution obviously challenge the power of the Legislature to take or impair such rights in favor of others whose situation is similar except in the matter of earlier appropriation to beneficial use.

The claim of vested right is based upon the theory that, prior to the enactment of chapter 182, it was the law of New Mexico either that the owner of the land had absolute ownership and dominion over such portion of the underlying waters as he could capture or that he had the right to reasonable use of such waters correlative with similar rights of other owners. Appellant, denying this vested right, contends that prior appropriation to beneficial use has always been, in this jurisdiction, the basis and measure of the right to the use of artesian water, and that chapter 182 is merely declaratory of the prior existing law upon the subject.

Upon what does the claimed vested right rest? It is not declared by Constitution or statute. The irrigation code declares public "all natural waters flowing in streams and water courses," and subjects them to appropriation for beneficial use. Code 1915, § 5654. The constitutional provision is substantially the same. Article 16, § 2. Appellees argue that the statutory and constitutional inclusion of this class of waters, as subject to appropriation, amounts to an exclusion of all others. It will be admitted, however, that both the statute and the Constitution in these affirmative provisions are merely declaratory of existing law. Under a well-known canon of construction, the rule invoked does not apply. State v. Trujillo, 33 N. M. 370, 266 P. 922.

The right claimed has never been declared in this jurisdiction by judicial decision. Hence it will be found, if at all, in the undeclared law. Ordinarily in such a case we say that we are controlled by the "common law as recognized

in the United States of America." Code 1915, § 1354. But under that section we recognize as controlling only so much of the English common law as is applicable to our condition and circumstances. Browning v. Estate of Browning 3 N. M. 659, 9 P. 677; Beals v. Ares, 25 N. M. 459, 185 P. 780. Moreover, as said by Mr. Justice Shaw, it is the spirit and the principle of the common law which is adopted by such wholesale statutes as ours rather than the letter or the particularly applied rule. Katz v. Walkinshaw, 141 Cal. 116, 70 P. 663, 74 P. 766, 64 L. R. A. 236, 99 Am. St. Rep. 35. That is why it is often said that our common law is adaptable; that, while its principles operate continuously, changed conditions modify its rules; that, when the reason for the rule ceases, so should the rule cease; that what we adopted was a general system of principles rather than a hard and fast code. Boquillas Land & Cattle Co. v. Curtis, 213 U. S. 339, 29 S. Ct. 493, 53 L. Ed. 822:

So it is not necessarily true that the rules governing the use of percolating waters in England have been, up to 1927, the rules for the use of artesian waters in New Mexico, any more than it is true that the taking of water from the Rio Grande is subject to the limitations upon taking from the Thames. Nor is it necessarily true that the rules which Massachusetts has drawn from the principles of the common law are the rules which those same principles would suggest and lead to in New Mexico, where conditions and circumstances are different, and which has a different legal background and history.

Nearly all of the states of the Union in a general way recognize the common law of England. Yet they have reached different results as to riparian rights and as to rights in percolating water. See annotation "Subterranean and Percolating Waters; Springs; Wells." 55 A. L. R. 1385. As is well known, a number of the Western States have rejected the doctrine of riparian rights for that of prior appropriation. The reason generally understood is that they have been induced by the peculiarities of climate and topography, and by the surpassing importance of water in any scheme for development, to establish by legislative or judicial declaration a basis of water right adapted to

conditions and demanded by economic necessity. Even among the Western States uniformity is not found, either in the extent of modification of the common-law doctrine of riparian rights or in the theory upon which modification has been based. New Mexico, in this respect, long since concurred in the "Colorado doctrine," the most far-reaching of all.

It was suggested in argument that, when the courts of the then Territory of New Mexico originally announced the doctrine of prior appropriation, they acted arbitrarily, in defiance of the common law, and in subversion of vested riparian rights. The idea presented is that, from the adoption of the common law in 1876, riparian rights obtained in New Mexico, and that they were overthrown by these decisions. But such was not their theory. The theory was that the right of prior appropriation obtained under Mexican sovereignty, continued after the American acquisition, and that the sweeping statute adopting the common law, 30 years later, as the rule of practice and decision, did not result in the adoption of rules inapplicable to our conditions, circumstances, and necessities, and subversive of rights long since vested and recognized. United States v. Dam.& Irrigation Co., 9 N. M. 292, 51 P. 674; reversed on different grounds, 174 U. S. 690, 19 S. Ct. 770, 43 L. Ed. 1136; Albuquerque Land & Cattle Co. v. Gutierrez, 10 N. M. 177, 61 P. 357; affirmed Gutierrez v. Land & Irrigation Co., 188 U. S. 545, 23 S. Ct. 338, 47 L. Ed. 588; Boquillas Land & Cattle Co. v. Curtis, supra. California history is quite different. Those who came there from the eastern part of the United States almost immediately after the change of sovereignty were in such numbers as to dominate the situation. Within a few months a state government was in control, and one of its early acts was to adopt the common law, including riparian rights, as the courts held. See address, "The Development of the Law of Waters in the West," by Chief Justice Shaw, 57 Reports of American Bar Association, 189. Chief Justice Shaw was the author of the opinions in Katz v. Walkinshaw (rehearing), supra, and City of San Bernardino v. City of Riverside, 186 Cal. 7, 198 P. 784—two of the leading cases

developing, for California, the doctrine of correlative rights.

It did not matter that the occasion to declare the law of prior appropriation did not arise until 1898, nor that some persons might have misunderstood the effect of the adoption of the common law, and might have made investments in the belief that they were acquiring riparian rights. As to each rule or principle of law not resting on statute, there must be a first statement. Kansas v. Colorado, 206 U. S. 46, 27 S. Ct. 655, 51 L. Ed. 956. When declared, it merely announces existing law. Statutes are also frequently declaratory, and section 1 of chapter 182 is of that nature, if, without its aid, this court could hold that appropriation to beneficial use is the basis and measure of the right to use the waters of an artesian basin.

It is argued that we are again asked to commit a rape of the common law, because of the further state of development and the greatly enhanced investment in reliance upon common-law rights. But, if such investments have been made under a mistaken idea of the law, the resulting hardship will be beyond the power of courts to relieve. The declaration of both courts and Legislature, and, subsequently of the Constitution, that priority of appropriation should determine the right to the use of the waters of running streams, did not necessarily exhaust the principles underlying such declarations. If the same principles justify the present legislative declaration, it does not matter that earlier occasion has not arisen to apply them. The courts act only upon controversies requiring decision. Legislatures indeed adopt general laws for future application, but, practically, only as situations develop requiring legislative action. The situation invoking the present statutory declaration may be assumed to have been the excessive use of some of the valuable subterranean waters of this state, resulting in the lessening of highly valuable artesian pressure; the drying up of wells; and the reversion of highly developed farms to a condition of nonproductiveness. Confronted with this situation, the Legislature has, in its wisdom, declared the rule for determining inter se the rights of the owners of overlying lands. If it has merely made new application of principles already

established, without having changed any declared or settled rule, we fail to see how any vested right has been disturbed. Persons contemplating investment in lands might well have considered that in the public policy of this state water is regarded as essential to existence and progress, and that, where waters were to be found in bodies sufficient to influence agricultural development, the right to their use would be worked out along lines consistent with former declared policy, the encouragement of use, and the discouragement of non-use or waste.

So we inquire: According to established principles and policy, and by analogy with particular rights already declared, what were the rights of persons owning lands over artesian basins?

There is a considerable body of decisions as to rights in artesian waters. But in few cases, if any, do we find present, or necessarily involved, the simple question here raised, namely, whether, as between owners of lands which nature has situated equally with respect to artesian waters, their rights to the use thereof upon such lands are to be determined according to prior appropriation to beneficial use. Most of the cases have arisen out of the attempt to divert waters for use beyond the limits of the basin. See decisions collected in annotation "Right to Conduct and Use Artesian Water out of Artesian Basin." 31 A. L. R. 906. An examination of such cases discloses a consensus of opinion that one who has lawful access to such waters may use them at pleasure, according to the common-law theory that the owner in fee has dominion to the center of the earth, but modified by the other common-law principle that each shall so use his own as not to injure others. The right thus resulting is to a reasonable use. It is held to include irrigation of the overlying land in which the well is sunk. This reasonable use may occasion loss to other owners, but it is *damnum absque injuria.* It is the unfortunate result of the exercise of an equal right. But employment of overlying land as a mere means to obtain water for the development of other lands, or as a source of producing an article of merchandise for sale, is not deemed reasonable. So, if the taking of water for use elsewhere damages other owners, it may be enjoined.

The "reasonable use" doctrine is based upon the correlative rights of owners of overlying lands, and results in giving priority to them as against those desiring to use the water elsewhere.

It at once suggests itself that this doctrine is not only quite consistent with that of riparian rights, but that it is reached by analogy with it. The ownership of overlying lands gives a preference to the use of the water because of the natural situation. Nature having united the land and the water, man is not to put them asunder. That is the fundamental idea of riparian rights. In arriving at the rule of "correlative rights," or "reasonable use," the courts have not been unconscious of the analogy suggested. They have constantly relied upon and invoked it. Weil in his work on Water Rights in the Western States (3d Ed. cc. 45 and 46), from which appellees copiously quote, constantly makes it plain that the "new law" of percolating waters is merely an application to such waters of the rules of riparian ownership.

As leading and illustrative cases in which this doctrine has been applied, appellee selects and cites Katz v. Walkinshaw, supra; Horne et al. v. Utah Oil & Refining Co., 59 Utah, 279, 202 P. 815, 31 A. L. R. 883; Glover v. Utah Oil & Refining Co., 62 Utah, 174, 218 P. 915, 31 A. L. R. 900 (both Utah cases being reported and annotated at 31 A. L. R. 906); St. Germain Irrigation Ditch Co. v. Ditch Co., 32 S. D. 260, 143 N. W. 124; Erickson v. Water Works, 100 Minn. 481, 111 N. W. 391, 8 L. R. A. (N. S.) 1250, 10 Ann. Cas. 843; City of San Bernardino v. City of Riverside, supra; Coachella Valley County Water District v. Stevens (Cal. App.) 266 P. 341; Rouse v. City of Kinston, 188 N. C. 1, 123 S. E. 482, 35 A. L. R. 1203. The Utah cases we shall separately consider. All others are from states which recognize riparian rights.

Where riparian rights prevail, it seems to us inevitable that the law of artesian waters should be worked out consistently with the idea of preserving the natural relation between the land and the water. But, where riparian rights have never been recognized, where whatever natural right may attend ownership of riparian land has been set aside

in the interest of the more productive use of water, the decisions cited are without force. Not only so, but the same reasoning which, upon the premise of riparian rights in running streams, leads to correlative rights in artesian waters, will, on the premise of prior appropriation of the waters of running streams, lead to the same basis of right in the waters of artesian basins. Time and space do not permit specific reference to the decisions which induce us so to conclude, but a reading of the cases cited by appellees, and those reviewed in the cited annotations, will, we think, prove convincing.

We are here considering "artesian basins, reservoirs, or lakes, the boundaries of which may be reasonably ascertained by scientific investigations or surface indications." Such bodies of subterranean water are the principal resource of the localities where they occur. Their employment to the best economic advantage is important to the state. According to the "correlative rights" doctrine, each overlying owner would have the same right—the right to use whenever he saw fit. The right does not arise from an appropriation to beneficial use, which develops the resources of the state. It is not lost or impaired by nonuse. Regardless of the improvements and investments of the pioneers, later comers or later developers may claim their rights. The exercise of those rights which have been in abeyance will frequently destroy or impair existing improvements, and may so reduce the rights of all that none are longer of practical value, and that the whole district is reduced to a condition of nonproductiveness. The preventive for such unfortunate and uneconomic results is found in the recognition of the superior rights of prior appropriators. Invested capital and improvements are thus protected. New appropriations may thus be made only from a supply not already in beneficial use. Nonuse involves forfeiture. A great natural public resource is thus both utilized and conserved.

In other jurisdictions these considerations, or similar, have caused modification of the common-law rule as to rights in percolating waters. But, limited by the doctrine of riparian rights, the courts could go no further than the principles of that doctrine permitted. Thus resulted the

rule of correlative rights. We are not so limited. When we once admit a modification of the common-law rule, as the majority of the states have done, there is no place for us to stop short of the rule of prior appropriation. Fortunately, that is the rule best adapted to our condition and circumstances, and the rule which the Legislature has declared. Nor are we limited by the fact that appellees' title is derived from the United States. Early congressional legislation had waived the common-law rights of the United States, as a landowner, not only as to surface streams, but as to percolating waters. Snake Creek M. & T. Co. v. Midway Irr. Co., 260 U. S. 596, 43 S. Ct. 215, 67 L. Ed. 423.

The Utah cases cited supra are of special importance since Utah, like New Mexico, has rejected the doctrine of riparian rights. In the Horn Case, the earlier, the question was whether a cause of action for an injunction had been stated; it having been alleged in the complaint that the owner of one small lot overlying an artesian basin had sunk numerous wells upon it and was diverting the waters for use beyond the basin, resulting in the drying up and diminished flow of the wells of other owners. As the court interpreted the complaint, it was not based upon any claimed rights resulting from prior appropriation, but the court took occasion to remark at the outset:

"If it could be inferred that such was intended as the basis of their claim, we would feel compelled to hold that the complaint does not state facts sufficient to sustain a right of that nature. There is nothing whatever to show that the water in question was the subject of appropriation under any law which recognizes the doctrine of 'First in time, first in right.' Rather does it appear, notwithstanding their allegations of priority, that plaintiffs base their right upon their ownership of the land upon which their wells were driven, which land in common with that of defendant, constitutes an artesian district beneath the surface of which exists the water in controversy under a superimposed cap layer or stratum of impervious material."

Careful consideration was given to the defendant's claim of the absolute right to the use of the water as at the English common law, and to the plaintiff's contention that such right is limited to reasonable use, and is correlative with the rights of other owners. The conclusion was in favor of the latter doctrine, and sustained the complaint.

In the course of the opinion, the view was expressed, apparently obiter, that a

"Reasonable use * * * should be limited first to his [the land owner's] just proportion according to his surface area, and, second, he should not be entitled even to this quantity to the injury of others similarly situated, unless it is reasonably necessary for the beneficial purposes to which he devotes the water."

In the succeeding and related Glover Case, the same defendant had purchased the rights of a large number of lot owners, and was diverting the waters for the same purpose as before. Seeking an injunction, the plaintiff alleged that, according to the surface area of her lot, she was entitled to 6.58 gallons of water per minute. Defendant's operations did not prevent plaintiff from obtaining that quantity of water. But she contended for a peculiar principle—a cross between prior appropriation and correlative rights. She urged that, in addition to that proportion of the whole supply which appertained to the area she owned, she was entitled to a proportionate share of waters not at the time in reasonable use. She relied strongly upon decisions said to hold

"That the doctrine of correlative rights or reasonable use of percolating water includes the idea that the water cannot be conveyed away, either for waste or use, from the land in which the water is found in its natural state."

The court pointed out, however, that, while such seemed to be the consensus of opinion, the decisions supporting it came from states committed to the doctrine of riparian rights, and so furnished no guide for a court governed by the law of prior appropriation. The court further said that, for the same reason which had led to the conclusion that the law of riparian rights would be incompatible with local conditions in Utah, "the rule contended for by appellant (plaintiff), if it ever was recognized and enforced in this jurisdiction, should be abrogated and abolished." Applying the theory of apportionment according to surface area, the plaintiff's admission that she was receiving her portion was held fatal to her cause of action.

There is much in these Utah decisions to support the position we here take. In so far as they reject prior appropriation as the basis and measure of the right to the

waters of an artesian basin, we are constrained to disagree with them. We are not ready to assume, however, that that learned court has necessarily said the final word on this subject. In neither case was the doctrine of prior appropriation pressed. In the Horn Case the relief sought was equally available under either doctrine. Had the conditions been different, and had the Legislature of Utah enacted such a statute as ours, there might have been a different pronouncement. With the utmost deference, we make this criticism of the Glover decision. It challenges what we accept as fact, that the doctrine of correlative rights of artesian owners is the natural and logical outgrowth of the common-law doctrine of riparian rights. Recognizing, as we do, that California decisions are not of controlling weight, the Glover decision nevertheless adheres to the doctrine of correlative rights, developed especially in California, instead of going to the root of the matter and applying the Utah doctrine of prior appropriation. The very reason which led the Supreme Court of Utah to reject that part of the correlative rights doctrine which limits reasonable use to use on the land, the fact that it is not adapted to local conditions, suggests, in our judgment, rather a rejection of the doctrine of correlative rights than a modification, resulting in equal rights—a result, in our view, no better adapted to local conditions, and unsupported by established principles.

In Idaho a statute (Rev. Code, § 3242) provided that "the right to the use of waters of rivers, streams, lakes, springs and subterranean waters may be acquired by appropriation." Under that statute it was held that,

"Where percolating water exists in a state of nature generally throughout a tract of land that has been subdivided, the ownership of which is held in different proprietors, * * * an injunction will issue to restrain any permanent interference by an adjacent land owner with the right to the use of subterranean waters acquired by a prior appropriator."

Bower v. Moorman, 27 Idaho, 162, 147 P. 496, Ann. Cas. 1917C, 99. The "reasonable use" doctrine was in that case examined and apparently rejected. This is the only case which we are able to invoke as precedent for the conclusion here reached.

In a later Idaho case, it was held by a divided court that prior appropriation did not apply to "mere percolating waters or waters gathered together in wells upon the lands of the owner of the fee." Public Utilities Commission v. Natatorium, 36 Idaho, 287, 211 P. 533. To what extent the later decision narrows the rule we need not inquire. The earlier case supports, and the later does not oppose, our conclusion that the waters of an artesian basin whose boundaries have been ascertained are subject to appropriation

In Vanderwork v. Hewes and Dean, 15 N. M. 439, 110 P. 567, the territorial Supreme Court held that it was not within the jurisdiction of the territorial engineer, under the statute (Code 1915, § 5643), to license an appropriation of water seeping from an unknown source. Whether subject to appropriation at all was left an open question. The court said that, if such water was subject to appropriation, "it would be governed by the general law of prior appropriation which is applicable to the arid lands of the West." The idea suggested is that the mere statutory subjection of some classes of water to the jurisdiction of the state engineer does not necessarily change the law as to other waters That being undoubtedly true, there would be nothing to prevent later extensions of such jurisdiction. The court read Katz v. Walkinshaw, supra, as applying to "the disposition of percolating water from large areas of land saturated with artesian water, * * * the same rules of law pertaining to surface and subterranean streams." It found that the seepage water in question was not of that character. Had it found otherwise, it would have had the question here present. And, if it had applied "the same rules of law pertaining to surface and subterranean streams," it would necessarily have held that the water was subject to prior appropriation, even though not by statute made subject to the jurisdiction of the territorial engineer.

So we are led to conclude that chapter 182 is fundamentally sound. We now pass to the consideration of objections to its present form.

Appellees contend that the attempt, by section 5 of the act, to delegate to 10 per cent. of the water users the power to put the act into effect, violates section 1 of article 4 of the Constitution, which vests such power in the Legislature; that the statute attempts to extend the provisions of existing laws without setting them out in full, in violation of section 18, art. 4 of the Constitution; that legislative power to determine the method and measure of appropriation and use is sought to be delegated to the state engineer in further violation of section 1, art. 4, of the Constitution; that any rules and regulations for the supervision and control of underground waters which the state engineer may have assumed to make are void because not authorized by the statute; that there is an attempt at class legislation in violation of section 18, art. 4, of the Constitution, and in violation of the Fourteenth Amendment; and, finally, that the act is void for indefiniteness and uncertainty, in that it fails to prescribe the manner of appropriation of water of artesian basins, or for the control thereof by any authority.

In considering these objections we, of course, have in mind the familiar principles that an act of the Legislature will not be declared unconstitutional in a doubtful case, and that, if possible, it will be so construed as to uphold it. ·

We do not construe section 5 as intended to delegate to 10 per cent. of the water users the power to determine whether in a particular case the act shall have effect. As we have already concluded, in its provision that the waters of artesian basins are subject to prior appropriation, the act is declaratory. Whether the state engineer shall have jurisdiction over such waters is, however, a matter for legislative determination. He will have such jurisdiction as the statute gives him. Vanderwork v. Hewes and Dean, supra. Before he can assume jurisdiction over underground bodies he must find that they have boundaries reasonably ascertained by scientific investigations, or by surface indications. That determination is, of course, to be made by him—not by 10 per cent. of the water users The petition which they are to file is merely the statutory method of invoking such determination.

The remaining objections do not require separate treatment. It would not be easy so to treat them, as the arguments overlap. Before proceeding, it may be well to take a brief survey of the statute.

It is apparent at once that, standing alone, the act would be subject to serious objections. That part of the statute still to be considered consists of four brief sections. The first declares certain waters subject to appropriation for beneficial use. The second places the waters, their appropriation and use, under the supervision and control of the state engineer. The third recognizes past beneficial use as an appropriation, subject as to further use to rules and regulations of the state engineer, not necessarily different from the rules applicable to the use of water newly appropriated. The fourth simply excludes domestic and stock-watering uses from the operation of the act.

If that were the sum total of law upon the subject, there might be force in the contentions that it attempted to confer legislative or arbitrary powers on the state engineer, and it would be worth considering whether, except as to waters already in use, the state engineer is given power to make rules and regulations. .

But each of the first three sections contains reference to the laws of the state. Manifestly it was intended to complete the statute in its meaning and operation by extending the provisions of other laws to include the subject-matter and conditions of chapter 182. There can be no doubt of the intended reference to chapter 114 of the Code of 1915, entitled "Waters," and particularly to article 1 thereof, entitled "Statutory Appropriation." Other existing law to which reference might have been made, and may have been intended, is chapter 101 of the Laws of 1925, as amended by chapter 149 of the Laws of 1927. Here artesian wells are defined; their construction, repair, and use regulated, etc. The original act failed to bring artesian wells within the jurisdiction of the state engineer, but the amendatory act did so. The latter, being an act of the same legislative session, should doubtless be construed *in pari materia* with chapter 182.

■ If these provisions of existing law have been properly extended, little, if anything, is left to the objections last stated. So we pass them and proceed to inquire whether the attempt to extend them was in violation of section 18, art. 4, of the Constitution.

This matter of extension statutes was considered by this court in State v. Armstrong, 31 N. M. 220, 243 P. 333, which both counsel rely upon. We there held that the Legislature could not, by reference, extend the penal provisions of the National Prohibition Act. But the decisions there reviewed pointed out, and we approved, a distinction, which we designated the "Arkansas Rule," and we said that we were not prepared to reject another distinction which we designated the "Kentucky Rule." The Arkansas rule permits reference to existing law for methods of procedure, but not to confer or take away positive and substantial rights. The Kentucky precedent upheld a reference to existing law for the conditions under which an expressly granted new right might be effectuated.

We have here held that, in declaring artesian waters subject to appropriation, the statute has neither created nor taken away a right, but we are not so sure that it has not done so in enlarging the jurisdiction of the state engineer and attempting to extend the existing statutes regulating the appropriation and use of water. A provision that the person desiring to appropriate subterranean water should proceed in the same manner as if he desired to appropriate surface water might perhaps be upheld, but a provision that the use of subterranean waters shall be subject to the same rules and regulations is different. It would seem, without deciding the question, that by such a provision positive and substantial rights would be created and perhaps taken away. For instance, in the absence of chapter 182, an appropriation would be deemed abandoned, unless reasonably continuous use were made of it. Under that chapter and the irrigation code, which it seeks to extend, nonuse for four years constitutes abandonment. Code 1915, § 5701. In the absence of chapter 182 whatever appeared to the courts to constitute waste would no doubt have been enjoined. Under chapter 182, if it be deemed to include, by reference, the artesian well act, waste is de-

fined, made punishable, and wells not properly equipped declared a nuisance. Laws 1925, c. 101, §§ 2, 3, 4 (as amended), 5, and 6. It is doubtful whether the Constitution permits such provisions to be extended by reference.

We pass this for the moment to inquire: To what "laws of this state" is reference made? In section 1 the reference is undoubtedly to the irrigation code. But section 2 is dubious. As to artesian waters there was a special act regulating their use and requiring application to the state engineer for a permit before a well could be constructed or repaired. This act has not been repealed. It cannot be ignored. The amendment to it is *in pari materia* with chapter 182. Attempting to read into section 2 the "laws of this state" as to "method and manner of appropriation and use" of underground waters, it would seem that as to artesian waters one must obtain a permit to appropriate under the irrigation code and a permit to construct a well under the artesian well code, and that the matter of abandonment would be governed by the irrigation code and the matter of waste by the artesian well code. If the waters were subterranean, but not artesian, what existing law would govern "the method and manner of use?"

We here approach appellee's contention that the statute is void for indefiniteness and uncertainty. We think, however, that these questions also bear on the contention that there has been a violation of article 4, § 18, of the Constitution. That section, literally, prohibits extension of existing statutes by reference. But, literally, it unreasonably and unnecessarily hampers the Legislature. So courts have construed the section as not prohibiting the extension of procedural provisions by reference. While this is a departure from the letter of the constitutional inhibition, it is not thought to violate its spirit and remedial purpose. That purpose is to prevent "blind legislation." State v. Armstrong, supra. But, if the reference to existing law, even in matters of procedure only, is so general as it is here, and the intent so uncertain, we have an instance of "blind legislation." The present extension is within the constitutional prohibition, and is not within the reason of

the established exception, and we must hold that it cannot be sustained.

In view of our conclusion, we find it unnecessary to consider whether chapter 182 is objectionable as class legislation. We also find it unnecessary to decide whether the finding of the trial court that the area in question contains two distinct artesian basins rather than one is supported by substantial evidence.

In the Tweedy Case, where the injunction was awarded, the only questions of law apparently raised were that the act sought to take away vested rights, and that it sought to delegate power to 10 per cent. of the water users to put the act into effect. We have here overruled both of these contentions. Consequently the trial court has not been put in error. Yet, as the judgment awarded an injunction to the state engineer, proceeding under powers not constitutionally conferred, it should not be upheld. State v. Newman, 31 N. M. 435, 246 P. 901.

These cases were argued during the 1929 legislative session, counsel being desirous of a decision in time to permit any legislation which the result might require. We regret that the difficulty of the questions presented and the extensive research and full consideration required have prevented us from earlier announcement of the opinion.

In appeal No. 3420 the judgment should be affirmed and the cause remanded, and in appeal No. 3408 the judgment should be reversed and the cause remanded, with direction to dismiss the complaint.

It is so ordered.

BICKLEY, C. J., and PARKER, J., concur.

ON MOTION FOR REHEARING

WATSON, J.

Because of the great importance of the case, and because of the change of personnel of this court since the foregoing opinion was handed down, the motion for rehearing has been argued orally and considered by the full bench as if upon rehearing. Nothing has been submitted

to cause us to depart from the views announced or the decision rendered. We therefore adhere to the original opinion and deny the motion for rehearing.

BICKLEY, C. J., and CATRON and SIMMS, JJ., concur.

PARKER, J. (dissenting).

I cannot agree that the opinion heretofore handed down, in which I concurred, should remain as the opinion of the court. The result reached by the court is undoubtedly correct in each of the two cases. But a doctrine is announced which I consider unsound and unsupported by any authority, viz. that percolating waters are, and always have been, subject to the right of prior appropriation. That the waters here involved are percolating waters seems to be beyond dispute, as the district court found. These waters are the result of precipitation in the form of rain and snow over a large area west of the artesian basin involved, and they find their way by natural laws of gravitation into a pervious stratum lying between two impervious strata. In finding their way through this pervious stratum, these waters filter through small holes and interstices running from the size of a knitting needle down to openings microscopic in size (as stated by one witness). They finally are dammed off, and the pressure behind causes them to rise to the surface, when the permeable stratum is tapped by a well, and thus to become what we call artesian waters. They nevertheless remain percolating waters, and the process of percolation goes constantly on as the draft upon them continues through the wells.

The question then is whether percolating waters were subject to law of prior appropriation before the enactment of chapter 182, Laws 1927, as declared in the opinion of the court, or whether they were the property, either absolutely or relatively, of the owners of the soil through which they percolated. The first proposition advanced in the opinion to which I do not agree is that under the civil law of Spain and Mexico the right of prior appropriation of percolating waters existed. See 2 Wiel on Water Rights (3d Ed.) § 1099, citing and quoting from Acton v. Blundell, 12 Nees. & W. 324, where it is said that the

civil law was the same as the common law in regard to percolating waters.

In the second place, we did not acquire the territory in which this artesian basin lies from Mexico, but we acquired it from the Republic (afterwards state) of Texas. See 8 U. S. Stat. 511; 5 U. S. Stat. 797; 9 U. S. Stat. 108; Id. 446, the act establishing the territory of New Mexico, and under which the United States paid Texas $10,000,000 to establish its western boundary where it now is and to cede to the United States all its claims to territory west of that line, Texas having theretofore claimed to the Rio Grande from its mouth to its source. See 9 U. .S. Stat. 1005, for proclamation by the President that said arrangement had been consummated. The United States has never received from Mexico any grant or cession of lands east of the Rio Grande. See Treaty of Guadalupe Hidalgo, Code 1915, p. 21, and the Gadsden Treaty, Code 1915, p. 32.

It thus appears that the civil law of Mexico has never been extended over the eastern part of New Mexico where the artesian basin in question is situated.

At the common law percolating waters were the absolute property of the owner of the fee, and he might use it or waste it at his pleasure. Dissatisfaction with this doctrine has developed in America, and what is called the American doctrine is generally accepted to the effect that the owner of the fee must make a reasonable use of the water, and the same may now be considered settled. But the right to use the water by the owner of the fee has in no way been destroyed or lessened by the adoption of the so-called American doctrine; he still has as against the world the right to capture and use it upon his own land for any useful purpose, even if by so doing he injures his neighbor. I do not deem it necessary to cite or discuss the cases in detail. They are all collected in a note to Clinchfield Coal Corp. v. Compton, 55 A. L. R. 1376, note beginning at page 1385.

There has never been any legislation in this state attempting to take away this right until the act of 1927, and

there has been no decision of this court attempting to do so. I assume that, if the limits of the capacity of the artesian basin has been reached by the draft already made upon it, the Legislature might, *perhaps,* declare these waters public waters under its police power, and make them subject to appropriations already made, but providing for due compensation to owners whose rights are thus curtailed; but, in attempting so to do, as it has done in the act of 1927, it has violated almost every guaranty in the Bill of Rights in the federal and our state Constitution, only one of which need be mentioned, viz. private property may not be taken for the public use without just compensation.

I understand the position taken in the opinion to be entirely unnecessary to a decision of the case; and do not believe that this court should, when unnecessary, indulge in a discussion and announcement of a doctrine which, to say the least, is of a very doubtful soundness and very far-reaching in its consequences.