LITTLE COTTONWOOD WATER CO. et al.

v. SANDY CITY, et al.

No. 7898.   Decided June 3, 1953.   (258 P. 2d 440.)

See 67 C. J., Waters, sec. 436. Appropriation of subterranean waters. 56 Am Jur., Waters, sec. 109; 109 A. L. R. 408.

*Christensen, Holmgren & Kesler,* Salt Lake City, for appellants.

*Victor G. Sagers,* Sandy, *Ben G. Bagley,* Midvale, *Clinton D. Vernon,* Atty. Gen., and *J. Lambert Gibson,* Asst. Atty. Gen., for respondents.

WADE, Justice.

An appeal from the decision of the State Engineer and the District Court approving the joint application of Sandy and Midvale cities to appropriate 1 cubic foot per second of underground water. Respondents propose to pump water from two wells near the mouth of Little Cottonwood Can-

yon and thereby increase the water available for use from the surface flow of Little Cottonwood Creek which increase they propose to appropriate for domestic use. The appellants, Salt Lake City and Little Cottonwood Water Company claim that the evidence conclusively shows that such pumping merely dries up the porous materials under the bed of the creek thereby allowing the surface stream to sink underground without increasing the volume of water available for use. We do not agree with that contention.

Little Cottonwood creek runs westerly down Little Cottonwood Canyon through the high mountains southeast from Salt Lake City. It veers to the north as it emerges from the Canyon across the Wasatch fault line and enters Salt Lake Valley. Murray City diverts water into its pipeline a short distance above the mouth of the canyon and carries most of such water a few miles northwest to its power plant, and thereafter the water is divided among the adjudicated owners, most of whom are parties to this action, for consumptive use. The pipeline will carry 30 cubic feet of water per second and all of the waters of the creek are diverted into the pipeline whenever the surface flow at the intake is less than its carrying capacity.

Little Cottonwood Canyon is thought to have been occupied by glaciers during various prehistoric periods and its bottom down to bedrock and at various places on its sides are filled with a deep bed of unconsolidated glacial materials. This material is porous and absorbs water like a sponge down to bedrock. Such water travels slowly underground probably not more than two or three feet per day, through the bottom of the canyon like passing through a trough filled with porous materials but cannot escape except out of the mouth of the canyon on the impervious bedrock which lines the bottom and sides of the canyon. When the water reaches the Wasatch fault line, much of it sinks through the break in the earth's crust down into artesian basins below and is lost to the natural surface streams until it reaches the Great Salt Lake.

When all the surface flow of the creek is diverted into the Murray City pipeline the creek bed is dry for a short distance down stream, but the diversion dam does not go down to bedrock or interfere with the underground flow. The stream of the creek from the pipeline intake to the mouth of the canyon is constantly increasing from the underground flow through small springs in the creek bed, spring areas on the sides of the creek and springs which emerge on higher ground, so the surface stream reappears a short distance below the diversion dam and increases in volume to the mouth of the canyon.

The South Despain Ditch which is diverted from the south side of the creek about 5100 feet down stream from the pipeline intake, is the first stream diverted below the intake, and about 200 feet further down the canyon widens out into the Despain Springs area. This area is about 300 feet wide and 1300 feet long. The Sandy and Midvale Wells are located on the table land south of this springs area, about 320 feet apart and about the same distance south of the stream; one is 61 and the other 75 feet deep. They were drilled prior to 1940 to insure clear water for domestic use when the creek water is muddy and have been used for that purpose ever since. The North Despain Ditch is diverted from the north side of the creek down stream from the west well, and further down stream and still within the springs area the Sandy Midvale pipeline is diverted from the south side of the creek. Just west of the springs area Salt Lake City has constructed a pipeline from the Murray City pipeline to the South Despain Ditch, then the canyon narrows and the creek runs through a deep rocky gorge, and to the south and west of which on higher grounds the Granite Company Springs appear. About 3000 feet down stream from the first springs area the canyon widens out and the creek turns toward the north, and to the south is the Beaver Pond Springs area. It runs north and south, is about 1000 feet long and about 300 feet wide at the south end but narrower to the north, and below this the Wasatch

fault line occurs at the western edge of the mountain range where the ground makes a sharp drop of about 60 feet.

Except for short periods at the peak of the high water runoff, all of the surface water from Little Cottonwood Canyon has long been appropriated and such rights adjudicated on June 15, 1910, by the Morse Decree. Respondents, who own some of such rights, filed their application to appropriate on April 18, 1941, since then, records have been kept to the effect of such pumping on the surface flow of water from all sources from this canyon. On November 21, 1944, after one pump had been in constant operation for a long time, in order to experiment on the effects thereof, both pumps were kept in almost constant operation until April 10, 1945. This test was conducted at a time when the surface stream is normally low and does not increase until the spring runoff begins, and it had the effect of drying all of the surface stream around the Despain Spring area; it affected somewhat the Granite Company Springs but had no appreciable effect on the Beaver Pond Springs area or the water at the fault line. The pumping was discontinued on April 10, 1945, when on account of the spring runoff the surface stream reappeared in spite of the pumping. Mr. Richards, an engineer of long experience, as City Engineer for respondents, Mr. Ward, an experienced engineer, representing the State Engineer's Office, and Dr. Marsell, a professor of geology at the University of Utah, representing Salt Lake City, each conducted experiments. These experiments demonstrated that while both pumps were operating, and the full stream was diverted into the Murray City pipeline at its intake, the water produced as a surface stream from all sources was .6 of a cubic foot per second greater than it was when they were not operating.

Shortly after this experiment closed, all of the available records and data were submitted to the State Engineer and approval of the application requested. The appellants protested such approval, and Mr. Ward continued to study

the situation until May 19, 1950, when on his recommendation the application was approved only

"during the period of time when all the flow of Little Cottonwood Creek is diverted through the Murray City pipeline and the time when there is more water available in Little Cottonwood Creek than is required to satisfy existing rights"

and such approval was "subject to prior existing rights." Respondents concede that the application to appropriate the surface water only if there is more than enough to satisfy all the adjudicated claims was properly approved. The only problem presented is whether the evidence establishes reasonable grounds to believe that the pumping of these wells produces more surface water for beneficial use than is naturally produced without such pumping.[1]

Respondents rely on the opinion of Dr. Marsell that pumping these wells produces no additional water. He gave the opinion that the porous material in the bottom of the canyon is in places as deep as 300 feet, that the pumping draws the water from a cone shaped area around each one not deeper than the well, that the materials which would be saturated by the water which is pumped from the well would all be saturated from surface water which otherwise would have run in a surface stream within a short distance down stream from the pumps and so none of the underground water would be prevented from reaching the Wasatch fault line. He conceded that there was a temporary increase in the volume of the water brought to the surface

---

[1]*Little Cottonwood Water Co.* v. *Kimball*, 76 Utah 243, 289 P. 116; *Eardley* v. *Terry*, 94 Utah 367, 77 P. 2d 362; *Tanner* v. *Bacon*, 103 Utah 494, 136 P. 2d 957; *Rocky Ford Irrigation Co.* v. *Kents Lake Reservoir Co.*, 104 Utah 202, 135 P. 2d 108; *Whitmore* v. *Welch*, 114 Utah 578, 201 P. 2d 954; *Lehi Irrigation Co.* v. *Jones*, 115 Utah 136, 202 P. 2d 892; *McNaughton* v. *Eaton*, 121 Utah 394, 242 P. 2d 570; *United States* v. *District Court*, 121 Utah 1, 238 P. 2d 1132, Petition for rehearing denied, 121 Utah 18, 242 P. 2d 774; *Whitmore* v. *Murray City*, 107 Utah 445, 154 P. 2d 748; *Riordan* v. *Westwood*, 115 Utah 215, 203 P. 2d 922.

when the pumps are operating. His experiments showed that in the spring area near the wells the starting and stopping of the pumps affected the surface flow within minutes and that such springs made a complete recovery within a few days at most after the pumping ceased, and that some springs which were considerable distance from the wells did not completely recover within 28 days. He concluded that this temporary increase would have to be replaced from appropriated waters from the surface. The two engineers, Richards and Ward, disagreed with this, concluding that the evidence shows that there was additional water produced although they did not attempt to explain geologically just how it could or might have occurred.

Appellants claim that this application does not propose to save water by a new diversion system but proposes to develop water from a new source. They further claim that all of the waters from this creek, including all of its sources of supply and support are fully appropriated, and since the evidence shows that the underground waters are in direct contact and communication with the surface flow, respondents have the burden of proof that the waters which they propose to appropriate comes from a different source. If all of those statements of basic facts were just as they sound then our problem would not be difficult. Some of them are correct, others require explanation, and some seem to be contrary to the facts. So a clarification is in order.

First, it is true that during most of the year all of the waters of this surface stream are fully appropriated. Also, no one can interfere with the source of supply of this stream, regardless of how far it may be from the place of use, and whether it flows on the surface or underground, in such a manner as will diminish the quantity or injuriously affect the quality of the water of

these established rights.[2] The evidence shows that a large portion of this underground flow never again reaches the surface stream and can only be used for carrier purposes. Such waters are unappropriated and available for appropriation if they can be extracted from the ground without interfering with the quantity or quality of water available for the use of the prior appropriators.[3] The fact that this water comes from the same source of supply as the surface stream which has been fully appropriated, and in a sense has been appropriated as carrier water to bring the surface water to the diverting works, does not make it unavailable for appropriation if it can be beneficially used without diminishing the supply available for prior appropriators. This is true although the surface stream and the underground waters are directly connected and affect each other.

The record does not support appellants' statement that the application is to appropriate a new supply of water and not to affect a saving by a new system of diversion. The application recognizes that the underground water is directly connected with and supports the surface flow and

[2] *Hanson* v. *Salt Lake City*, 115 Utah 404, 205 P. 2d 255; *Richlands Irr. Co.* v. *Westview Irr. Co.*, 96 Utah 403, 80 P. 2d 458; *Rasmussen* v. *Moroni Irr. Co.*, 56 Utah 140, 189 P. 572; *Salt Lake City* v. *Gardener*, 39 Utah 30, 114 P. 147; *Sullivan* v. *Northern Spy Mining Co.*, 11 Utah 438, 40 P. 709, 30 L. R. A. 186; *Herriman Irr. Co.* v. *Keel*, 25 Utah 96, 69 P. 719; *Peterson* v. *Wood*, 71 Utah 77, 262 P. 828; *Wrathall* v. *Johnson*, 86 Utah 50, 40 P. 2d 755; *Justesen* v. *Olsen*, 86 Utah 158, 40 P. 2d 802; see also Hutchins, Selected Problems in the Law of Water Rights in the West, pages 173 to 180, dealing with "Appropriations of Ground Water." Note that the cases which are cited are in accord with the above statement, but that the author suggests a contrary rule under the Utah law, which would be less favorable to appellants, also note our comment on those cases and the suggested rule in *Hanson* v. *Salt Lake City*, supra. See also section 73-3-23, U. C. A. 1953, formerly section 100-3-23, U. C. A. 1943, granting the right of replacement "to any junior appropriator whose appropriation may diminish the quantity or injuriously affect the quality" of prior appropriators, but providing that such replacement be "at the sole cost and expense of the applicant".

[3] See authorities cited in Note 2, and *Little Cottonwood Water Co.* v. *Kimball*, supra, and *Eardley* v. *Terry*, supra, cited in Note 1.

that the pumping will diminish that flow. It expressly proposes to use the waters which are pumped from the wells to replace in full the waters of the natural stream the same as they would have been without the pumping. Respondents claim the right to appropriate only the amount of additional water which they can produce above the amount required to replace in full the stream which would have flown in the surface stream without the pumping. If through the pumping additional water is actually produced and respondents can furnish adequate proof that fact they are entitled to appropriate such additional water. I do not understand that appellants claim otherwise.

The difficult problem is to determine whether the pumping produces additional water. The evidence shows that the pumping directly and immediately affects the surface stream. The size of mountain streams such as this being dependent on many factors, does not remain constant but fluctuates from one season to another and sometimes from one day to the next, so while the pumps are operating there is no way to tell exactly the size which the stream would have been without the pumping. If the pumping caused a proportionately large increase, then it would be readily ascertainable that there was an increase but the exact amount of increase could still be uncertain. There is also the further problem of determining whether the increase is merely temporary to be followed by a decrease, as claimed by Dr. Marsell. Though the problem is difficult and filled with uncertainties, the application should not be denied and thereby close the door to future attempts to save such underground waters for beneficial use.

The cases do not sustain appellants' position that a showing must be made that a new source of water has been found, they merely hold that there must be a showing that additional water can be beneficially used without interfering with prior rights. The cases are clear that in cases of this kind, before an appropriation of such waters can be made there must be a showing

by "satisfactory evidence" that the waters claimed have not heretofore been appropriated.[4] That such is and should be the law we have no doubt.

But those cases were dealing with an action to determine the right to the use of the waters in question. Here we are concerned only with whether the application to appropriate should be approved. The effect of such an approval is to allow the applicant to proceed with his plans to try to appropriate new water. It does not adjudicate that there are unappropriated waters in the source claimed nor that the proposed plan or system will have the effect of producing such waters. It merely has the effect of allowing the applicant to proceed with their plans to appropriate unappropriated waters. It means that applicants are allowed to make the necessary experiments to determine whether new waters are being produced; it gives them no right to take and use disputed waters until a certificate of appropriation has been obtained, or an adjudication is made that such an appropriation has been accomplished. Such being the case the application should be approved if the evidence shows reasonable ground to believe that unappropriated waters may be appropriated under the application.[5] Such a policy encourages development of the water sources of this State which are so badly needed. But before such appropriation can be established there must be a showing by satisfactory proof that such water has not been previously appropriated.

Judgment affirmed with costs to respondents.

WOLFE, C. J., and McDONOUGH, and CROCKETT, J.J., concur.

HENRIOD, J., concurs in the result.

---

[4]*Silver King Consol. Mining Co.* v. *Sutton*, 85 Utah 297, 39 P. 2d 682; *Mountain Lake Mining Co.* v. *Midway Irr. Co.*, 47 Utah 346, 149 P. 929; *Bastian* v. *Nebeker*, 49 Utah 390, 163 P. 1092; *Midway Irr. Co.* v. *Snake Creek Mining & Tunnel Co.*, 260 U. S. 596, 43 S. Ct. 215, 67 L. Ed. 423.

[5]See cases cited in Note 1 above.